## SADLER vs. LANGHAM.

## MOORE vs. WRIGHT & RICE.

[APPLICATIONS FOR ESTABLISHMENT OF PRIVATE ROAD AND MILL-DAM.]

1. *Constitutionality of statutes authorizing establishment of private roads and erection of mill-dams.*—The several statutes of this State, authorizing the establishment of private roads across the lands of third persons, (Code, §§1187– 88.) and the condemnation of their lands for the erection of mill-dams, (§§ 2089–2105,) are unconstitutional, inasmuch as they authorize the taking of private property for other than public uses ; and the fact that such statutes have long been in existence is not a sufficient reason why the courts should not now declare them unconstitutional.

THESE two cases were argued and submitted separately. The former was brought up by appeal from the circuit court of Greene, and was there tried before the Hon. JOHN GILL SHORTER; the latter was an appeal from the probate court of Lauderdale. The material facts shown by the record in each case are as follows :

At the regular November term, 1855, of the court of county commissioners for Greene county, Mitchell M. Langham and nineteen other citizens of the county presented their petition, asking the establishment of a private road, "leading from the Erie road north to the Hester road, on the section line between William G. Sadler and said M. M. Langham." The establishment of this

road was contested by said Sadler, through whose lands the route of the proposed road lay. At the regular May term, 1856, the following judgment was rendered by said commissioners' court: "It is therefore ordered, adjudged and decreed, that the report of the jury of review be, and the same is hereby, ratified and confirmed; and that the said applicants are entitled to the right of a private road, as therein set forth and more particularly described, to-wit," &c., (describing the road;) "and it is further ordered, that the said road be, and the same is hereby, established as a private road in said county, upon the following terms, provisions, and conditions—that is to say, that said private road shall not be opened until after the 10th day of July, 1856, nor until the present growing crop on the lands of W. G. Sadler and Rachel Day are gathered; nor shall the parties have a right to open said road until they shall have first executed a bond, with at least two good sureties, in the penal sum of $2,000, payable to W. G. Sadler and Rachel Day, between and on whose lands said road as marked out will run, conditioned to pay them such damages as they may sustain and show they have sus-tained by reason of opening said road in the manner provided by law."

After the rendition of this judgment, the contestant applied to a circuit judge, by petition, for a *certiorari* and *supersedeas*, to remove the proceedings into the circuit court, and to restrain further action under the order of the commissioners' court; assigning as error on the record returned to the circuit court, in addition to several particular informalities in the proceedings, that the judgment was based on such conditions as made it void, and that the statute authorizing the establishment of private roads by order of the commissioners' court was unconstitutional and void. On the hearing of the case in the circuit court, that court dismissed the *certiorari*, and rendered judgment for the costs against Sadler; and its judgment in that behalf is here assigned as error.

In the other case, the proceedings were commenced by petition by James Wright and W. F. Rice, asking the

probate court of Lauderdale to grant an order authorizing the erection of a mill-dam by them, and to issue a writ of *ad quod damnum* to ascertain the damages thereby caused to the owners of the lands on which one abutment of the mill-dam would rest. The petitioners alleged, that they were citizens of said county of Lauderdale, and had erected on a certain creek in the county a foundry, machine-shop and grist-mill, propelled by water; that they were the owners of the lands on which the foundry was erected, and through which the race ran for supplying the machinery and grist-mill with water; and that the lands on the opposite side of the creek, on which they proposed to abut one end of their mill-dam, were claimed by Lewis C. Moore and his wife, whom they prayed to be made parties defendant to the petition. The court granted the writ of *ad quod damnum* as prayed for, directing the summoning of a jury as provided by the statute; and Moore and wife were served with a copy of the petition, and notified of the time and place for the meeting of the jury. At the next term of the court, to which the inquest of the jury was returned, Moore and wife appeared, by attorney, and moved to quash the proceedings on account of certain specified defects in the petition, the writ of *ad quod damnum*, the summoning of the jury, and the execution of the writ. The court overruled all their objections to the regularity of the proceedings, and rendered judgment in favor of the petitioners, in these words: " It is therefore considered and ordered by the court, that said Wright & Rice, the plaintiffs in this cause, have the right, and that they be permitted to erect a dam across Cox's creek, at the place designated in the report and inquest made by the jury, to the height of three and a half feet from the surface of the water, and to abut their dam on the land owned by Lewis C. and Atlantic Moore, as marked out in the inquest of the jury appointed and summoned by the sheriff in said cause. It is further ordered, adjudged and considered by the court, that said Lewis C. Moore and Atlantic Moore pay the costs incurred in this proceeding, and that the plaintiffs recover of them their costs in this behalf expended. It is further

ordered, that the plaintiffs pay to the defendants the sum of twenty-five dollars, the amount assessed by the jury for said acre of land." The defendants reserved exceptions to the overruling of their several motions and objections, and they now assign the same as error, together with the rendition of judgment for the plaintiffs.

D. W. BAINE, with whom were J. D. WEBB and R. F. INGE, for the appellant Sadler, made the following points:

1. The legislature has no power to take the property of one man by any legislative act, without his consent, and give it to another.—Wilkinson v. Leland, 2 Peters, 657; Taylor v. Porter, 4 Hill, 144; *In re* Albany Street, 11 Wendell, 149; Bloodgood v. Mohawk R. R. Co., 18 Wendell, 59; 19 Wendell, 659; 5 Paige, 137; Clack v. White, 2 Swan, 540; Ten Eyck v. Delaware Canal Co., 3 Harr. 200; Embury v. Conner, 2 Sandf. (Sup. Ct.) R. 106; *Ex parte* Martin, 8 English, 198; People v. White, 11 Barbour, 30.

2. A statute, authorizing a private road to be opened through one man's land, for the benefit of another, is a taking of property for private use, within the meaning of the above rules.—Taylor v. Porter, 4 Hill, 144; Clack v. White, 2 Swan, 540. A private road may be laid out, under a statute similar to section 1187 of the Code, without any regard to public convenience.—Pettengill v. County Commissioners, 8 Shep. (Me.) 380. Such a road may be laid out in such a way that the public could not use it, as where the entire road was on private property. Reynolds v. Reynolds, 15 Conn. 97. The utmost that has ever been contended, in favor of the power of the legislature over private property, is, that the use may be considered public if a portion of the public have an interest in the appropriation.—Newcomb v. Smith, 1 Chandler's (Wis.) Rep. 77; Hartwell v. Armstrong, 19 Barbour, 168. If our statute is valid at all, it authorizes a road to be laid out upon the land of another, where the public does not need it, where the public cannot use it, and where the sole benefit will be individual. It forbids an inquiry into the question of public convenience or neces-

sity. If it be conceded that the public might use such a road, the concession could not aid this law, because the public use is not the consideration in establishing the road. The public may use a hotel when erected, and its erection may be a public convenience; yet the legislature certainly could not take one man's land, and give it to another, for the erection of a hotel. While each citizen holds his property in subordination to the right of eminent domain existing in the State, and must yield it up in obedience to that right when required by public convenience or necessity, he is not bound to yield it up for a use which is not pronounced public by either the legislature or the courts; and after his property has been taken professedly for the benefit of an individual, it is no answer to him to say that the public may share in the enjoyment of what was thus taken. If the public necessity is strong enough to demand his property, let it be taken on that ground, and he must be content; but, when the public benefit is too weak to demand it, and it is taken solely because individual convenience requires it, it is a mere mockery to tell him that his property has been taken for public use.—Harding v. Goodlet, 3 Yerger, 53.

3. A private road, granted under the Code, cannot be used by the public as a matter of right. There is no distinction between such a private road and a private road obtained by grant or prescription; and it is settled, in case of the latter, that trespass would lie against a stranger for entering upon the road.—Commonwealth v. Low, 3 Pick. 413. The statute authorizing the road confers upon the public no right to use it. The provision requiring the road to be opened and kept in repair by the person on whose application it is established, without exemption from work on public roads, is but an affirmance of the common-law rule as to other private roads. No action or indictment would lie for the failure to open or repair the road.

4. As to the want of "just compensation," see Thompson v. Grand Gulf R. Co., 3 How. (Miss.) 240; 1 Baldwin, 205.

5. The case of the Pocopson Road, 16 Penn. St. R. 17,

is founded on Harvey v. Thomas, 10 Watts, 66, which holds, that private property may be taken for private use without compensation. This is so palpably wrong, and so directly at war with all the adjudicated cases, that no argument is required to answer it.

WM. P. WEBB, with whom was WM. E. CLARKE, contra:

1. The private-road law stands upon the same authority and principle as the public-road law, and differs from it only in name.—Perrin v. Farr, 2 Zabr. (N. J.) 356; Harvey v. Thomas, 10 Watts, 63; also, Judge Nelson's dissenting opinion in Taylor v. Porter, 4 Hill, 150.

2. The assumption that, in case of a private road, private property is taken for private use, is a mere petitio principii. On the contrary, every person may use such private road, and it is as much open to the use of the public as to the man on whose application it is granted, who himself uses it in the discharge of public duties. 2 Stew. & Porter, 202; and authorities above cited.

3. Although it is called a private road, it is only an easement. It does not divest the right or title of the owner of the fee.—Perley v. Chandler, 6 Mass. 454; Angell on Ways, 2; 2 Stew. & P. 214; 2 Gilman, 238; 5 Gill, 389.

4. The right of eminent domain belongs to the State, and authorizes her to provide roads for the use of her citizens, particularly where they are required to perform public duties, as to muster, vote, work on roads, serve on juries, &c.—Judge Nelson's opinion in 4th Hill, supra; also, Young v. Harrison, 6 Geo. 146.

5. The right to establish roads, public or private, cannot be determined or measured by the number of persons, or the extent of their use. It is enough if the public may use the road: that makes it public, although applied for as a private road; and as the public good or benefit requires that a man shall perform public duties, the legislature is the sole judge of the expediency of the act. 2 Stew. & P. 211; 2 Gilman, 238; Angell on Highways, p. 61, § 84.

6. The case of Taylor v. Porter, 4 Hill, cited by appel-

lant, does not apply to the case at bar; because the New York statute, unlike ours, vested the fee in the grantee, his heirs and assigns. Nor does the position taken by Judge Bronson in that case—that the act was unconstitutional because the compensation was not assessed by "due course of law"—apply to this case.—2 Stew. & P. 218, where the right of way, taken for a railroad, was compensated in the same way, and it was held valid. And all the cases in which railroads have been established, (cited in 5 Paige, 137, and 18 Wendell, 45,) proceed on the principle that compensation may be made in this way.—See Young v. Harrison, 6 Geo. 146.

7. The case of Harding v. Goodlet, 3 Yerger, 52, was an application for a grist-mill, saw-mill, and paper-mill; and the court said, that the proceeding was unauthorized, because the saw-mill and grist-mill are used for private interests alone. But the court also decided, that the law condemning land for a grist-mill was not unconstitutional. As to the expediency and extent of the exercise of the right of eminent domain in such cases, see 3 Paige, 73.

8. As to the sufficiency of the compensation, and the mode of estimating the damages, see 4 Litt. 328; 1 Marsh. 85; 3 Paige, 45; 5 Paige, 137; 5 Blackf. 386; 8 Wendell, 85; 18 Wendell, 1.

9. In a doubtful case, the courts will not declare a law unconstitutional.—6 Cranch, 128; 1 Cowen, 550.

R. W. WALKER, for the appellants, Moore and Wife:

1. In all cases, where the private property of a citizen is taken from him without his consent, the record should affirmatively show that it was so taken for a public use; for, unless it was taken for a public use, the proceeding is unauthorized and void. But the record in this case nowhere shows that the dam sought to be erected was intended to subserve any public use. The petition states, that the petitioners "have now in operation a foundry, machine-shop, and grist-mill;" but it does not disclose what kind of foundry, machine-shop, or grist-mill. Even if foundries, machine-shops and grist-mills can ever be

considered public uses within the meaning of the consti-
tution, (and it is submitted that they cannot be so
considered,) they may nevertheless be obviously designed
for private uses merely.   For aught that appears in the
record, the private property of the appellants has been
condemned for the private uses of the appellees.   The
judgment simply shows that private property has been
taken, but nothing more.   No proceeding can be sus-
tained on the doctrine of eminent domain, unless these
two things are distinctly shown by the record : 1st, that
the property was taken for a public, and not for a private
use; and, 2d, that due compensation to the owner has
been provided for.

2. Admitting that the dam is shown by the record to
have been authorized for a public use, it is submitted that
the statute, under which the proceeding was had, is
unconstitutional.   Section 2089 of the Code seems to con-
template the erection of dams for any purpose.   On the
supposition that it is to be so construed as to authorize
the erection of dams only for the purposes designated in
section 2090, namely, for "mills or other machinery;"
still, this law, on its face, authorizes dams to be erected
with the view of running any kind of mill, or any kind
of machinery.   Under this law, the man of wealth and
taste could erect a dam, first condemning his neigh-
bor's property therefor, for the purpose of adorning his
grounds with fountains ; a planter could build a dam with
the view of running his cotton-gins by water power, or
for the purpose of sawing lumber to build negro-cabins,
or to make fences, exclusively for his individual use and
benefit.   It is impossible to sustain such a law as con-
stitutional.   A statute which seeks to enforce the right
of eminent domain, must designate and define the partic-
ular public uses for which the property of the citizen may
be taken.   If its terms justify a taking for private as well
as public uses, it is unconstitutional and void ; unless,
indeed, it be so framed that the clause which allows the
taking for private use is distinct and separate from that
which authorizes it for the public use.   The words of this
statute are not susceptible of any such division or separa-

tion. The same words authorize one man to condemn private property for a public grist-mill, and another to condemn it for a private saw-mill, or for any other kind of mill or machinery for his individual use and benefit. The words which justify the taking for public use, and those which allow it for private use, are identical and indivisible; and the entire act is, therefore, unconstitutional.—Pettit's Adm'r v. Pettit's Distributees, 32 Ala. 288, and authorities there cited; Mobile & Ohio R. R. Co. v. The State, 29 Ala. 584, and authorities cited. If the terms of the statute embrace private as well as public uses, and are indivisible, the whole act is as completely void as if it failed to provide for compensation to the owner; for both of these conditions (compensation and public use) are " inseparable attendants" upon the exercise of the right of eminent domain.

That an act which fails to provide for compensation to the owner, is void, see Sedgwick, 515, 526; Embury v. Conner, 3 Comstock, 511; Taylor v. Porter, 4 Hill, 140; 3 Paige, 73; Bloodgood v. Mohawk & Hudson R. R. Co., 18 Wendell, 9, 59; Brewer v. Duncan, 9 Geo. 37; Cushman v. Smith, 34 Maine, 247; 19 Barb. 118; 18 Pick. 501; 2 Kent, 339–40, and notes. "If the government authorizes the taking of property for any other than a public use, or fails to make provision for compensation, the act is simply void."—2 Gray's (Mass.) R. 9, 37. The act must " declare a public use."—Lumbard v. Stearns, 4 Cushing, 60.

No instance has been found, in which an act of the legislature, taking private property, has been sustained, unless it was disclosed upon the face, and by the terms of the act, that the use was a public, and not a private one. Here the terms are, " mills or other machinery;" but what sort of mills, or what kind of machinery, is not specified. The public has no interest in a private mill, and takes no benefit from it; and yet it comes within the terms of the statute. A cotton-gin, which gins but one man's cotton; a saw-mill, which saws lumber for only a single plantation; a distillery, which corrupts a neighborhood, and destroys public morals,—are certainly not

public uses, yet each is as clearly embraced in the terms of this statute as a public grist-mill, or water-works designed to supply a city with water.

As to the constitutionality of this law, and that the uses declared in it cannot be deemed public, see Taylor v. Porter, 4 Hill, 140 ; Clack v. White, 2 Swan, 540 ; Embury v. Conner, 3 Comstock, 511 ; Ten Eyck v. Delaware Canal Co., 3 Harr. 200 ; 18 Wendell, 9, 16, 20, 59, 66 ; Harding v. Goodlet, 3 Yerger, 41, 53; Smith's Com. 495 ; Hay v. Cohoes, 3 Barbour, 47 ; Stowell v. Flagg, 11 Mass. 364.

3. But, conceding that a grist-mill, which is nowhere shown to be a public grist-mill, can be considered a public use; still this proceeding, which seeks the erection of a dam for the purposes of running a grist-mill and operating a foundry and machine-shop, cannot be sustained. An application for such complicated purposes, some of which are so clearly not public uses, must be refused *in toto*.—Harding v. Goodlet, 3 Yerger, 41, 53.

Jno. S. & E. W. Kennedy, *contra*, submitted no brief or argument on the constitutional question involved.

STONE, J.—As the most material inquiry in each of these cases depends on the same questions, constitutional and statutory, we propose to consider them together. Justice R. W. Walker, being of counsel in one of the cases, does not sit in either.

In determining the nature of the intendments to be indulged in construing clauses of our written constitutions, the courts of the United States can derive but little aid from English decisions. This grows out of the fact, that with us, both the legislative and judicial departments are limited in their powers by the provisions of the local constitution ; while in England, parliament is said to be omnipotent, save as that body feels itself under the moral restraint of certain political axioms, much less comprehensive than the provisions of the constitutions of this country.

Unquestionably, it is our duty to presume that the leg-

islature, in the enactment of any given statute, has not transcended its powers. This presumption is but the result of two maxims of the law, namely, *omnia presumuntur rite esse acta*, and *ei incumbit probatio, qui dicit*. In all cases, then, where the constitutionality of a statute is brought in question, the burden of proof is on him who asserts the unconstitutionality.

On the measure of proof necessary to set aside a statute as unconstitutional, the language of the adjudged cases varies. In some cases it is said, that the expressed will of the legislature ought not to be disregarded, unless the unconstitutionality be *clearly demonstrated*. In another case it is said, that we should not hold that the legislature had exceeded its power, *except in cases admitting of no reasonable doubt*.—See Fletcher v. Peck, 6 Cranch, 87 ; Morris v. People, 3 Denio, 381 ; DeCamp v. Eveland, 19 Barb. 81 ; Clark v. People, 26 Wen. 599. With due respect, we think this language entirely too strong. It indulges, in favor of legislative infallibility, the same strength of presumption as that which obtains in favor of innocence when the life or liberty of the citizen is jeoparded in the courts of criminal jurisdiction. Constitutional provisions are intended as a protection to life, liberty and property, against encroachment, intentional or otherwise, at the hands of the government. Had not the framers of our system of government supposed it possible that legislative bodies might fall into error, they would not, in their sovereign capacity, have adopted a written constitution, superior alike over themselves and the legislature. We cannot believe that construction a sound one, which indulges every reasonable presumption against the citizen, when the legislature deals with his rights, and gives him the benefit of every reasonable doubt, when his life and liberty are in jeopardy before the courts of the country.

A controlling purpose with the founders of our representative system, was to prevent abuse and oppression, by incorporating into the fundamental law a nicely adjusted system of checks and balances. Hence, they divided the government of Alabama, as of most or all of the other States, into three distinct departments ; and confided each

department to a separate body of magistracy.—Cons. of Ala., art. 2, § 1. · Each of these bodies is, separately and for itself, charged with the protection and preservation of the inalienable rights of the citizen; and while we freely concede that it is the duty, and doubtless the pleasure of each, to presume that the others will keep within the bounds of constitutional authority, yet that presumption is not conclusive; nor should we, in its indulgence, forget that there is committed to us, equally with the other departments, the trust of guarding and protecting the life, liberty and property of the citizen, as guarantied by the constitution.

The language employed by the court in Lane v. Dorman, 3 Scam. 238, expresses our views so exactly that we adopt them as our own. Speaking of the question under discussion, that court said: "Unless it *be clear* that the legislature has transcended its authority, the courts will not interfere." This is little more or less than was said by this court in the case of Haley v. Clark, 26 Ala. 439. In considering the constitutionality of an act of the legislature, the question was, had the legislature attempted to exercise the pardoning power, which our constitution vests in the executive? We said, "If that purpose *appears* on the face of the act, courts could not do otherwise than declare it invalid."

As a corollary to what is cited above from 3 Scammon, we hold that if it *be clear* that the legislature has transcended its authority, it is our duty to pronounce such act unconstitutional.

The main question, upon the discussion of which we are entering, brings up for decision the second clause ef section 13 of the bill of rights, which forbids that "any person's property be taken or applied to public use, unless just compensation be made therefor." Most of the State constitutions in this confederacy contain a clause substantially like ours.—See them collected in Sedg. on Stat. & Con. Law, 495-6-7. Many decisions have been made, by different appellate courts, on the clause above copied, and much diversity of opinion will be found to exist in regard to several of its features. The following questions,

growing out of the language of this clause, have been much discussed:

1st. What is meant by the phrase, public use?

2nd. In what manner, and by whom, is the question whether or not the proposed use is public to be determined?

3rd. Must the compensation be paid before the property is taken, or may it be secured for after payment?

4th. The prohibition being only against taking property of another for *public use*, may it be taken for private use?

The first and second of the above questions are far the most important and difficult. Their difficulty is enhanced by the irreconcilable conflict observable in the adjudged cases, as mentioned above. We think, also, that the question is much embarrassed by the fact that, in some cases, there has been an apparent failure to observe properly the distinction between the *public use*, which is mentioned in the 13th section of our bill of rights, and *public services*, as found in the 1st section of the same instrument, which reads as follows: "No man or set of men are entitled to exclusive, separate public emoluments or privileges, but in consideration of public services." Section 13 authorizes the *taking* of property *from* the citizen, for the use of the public. Section 1 *limits* the power of the legislature, in *conferring* emoluments and privileges *upon* the citizen, to cases in which *public services* are rendered as an equivalent or consideration. In the one case, property passes from the individual to the public; in the other, from the public to the individual. In the one case, the legislature, representing the sovereignty, takes the property of the citizen without his consent—a mere exercise of the right of eminent domain; in the other, it grants to, or contracts with the citizen, itself being one of the parties to the contract. The one protects the private property of the citizen from oppressive seizure at the hands of the legislature; the other ties the hands of the legislature against a reckless and improvident bestowal of franchises and other emoluments within its gift. The one qualifies the *right* to take; the other, the *power* to give.

The constitutionality of private corporations is frequently subjected to the test furnished by the 1st section of the bill of rights. Charters for banks, insurance companies, railroads, and many corporations for commercial and manufacturing purposes, although conferring privileges not enjoyed by the citizens generally, have been pronounced constitutional, because of the *public services* which such corporations are supposed to perform. The *services* are the increased facilities to commerce, the employment given to labor, and the increase of public wealth, consequent upon the creation of such chartered companies.—See Daughdrill v. Ala. Life Ins. & Trust Co. 31 Ala. 91, 97–8; Curry v. Mutual Ins. So., 4 Hen. & Munf. 315; Aldridge v. Tus. R. R. Co., 2 S. & P. 211; Dartmouth College v. Woodward, 4 Wh. 637.

This principle may be stated in another form. Private charters are contracts, in the strict sense of that term. On the part of the corporators, the obligations tendered, to employ technical language, are expressed in the words, *facio ut des.* The legislative assent is, *do ut facias.* This being a concurrence of two minds, *aggregatio mentium*, constitutes a contract. The *public services* afterwards to be performed by the corporation, are the executory consideration. The charter granted by the legislature is the executed price of that executory consideration. Being a contract upon a consideration " deemed valuable in the law," it follows that the courts of the country are clothed with no power to inquire into the adequacy of the consideration. Such contract can only be annulled and rescinded, by the consent of the parties, by a failure by the corporation to perform some condition of the contract, precedent or subsequent; or for fraud, perhaps, in procuring the charter. That the courts cannot pronounce on the adequacy of the consideration, or whether the public will be benefited by the services to be performed by the corporation, see authorities *supra ;* and see Addis. on Contr., 11, 17; 1 Parsons on Contr., 361–2–3.

The constitutional question presented in the two records under discussion, arises in the construction of section 13 of the bill of rights. The phrase, public use, as we have

seen above, was inserted for an object entirely different from that which prompted the incorporation of that other phrase, public services. It is our purpose to show that it was employed in a sense equally different.

We do not attempt, nor should we be able if we did, to express all the *uses* which the law would pronounce *public*, under this section of the bill of rights. Some of the private corporations enumerated above, which rest their constitutional existence on the 1st section of the bill of rights, are declared, in many well considered opinions, to furnish to the public that *use* which, under section 13 of the bill of rights, justifies the legislature in conferring on them power to condemn private property for the promotion of their corporate purposes. Rail-roads, plankroads, canals, &c., are of this class. This principle is too well settled to be now desturbed.—Boston & C. R. Cor. v. S. & L. R. Co., 2 Gray, 1; Bloodgood v. M. & H. R. R. Co., 18 Wen. 9; Com. v. Breed, 4 Pick. 463; Backus v. Lebanon, 11 N. H. 19; White River T. Co. v. Vermont C. R. R. Co., 21 Ver. 590; Young v. Harrison, 6 Geo. 130; same case, 3 Kelly, 31; Conwell v. Hagerstown C. Co., 2 Car. 588; Bradley v. N. Y. & N. H. R. R. Co., 21 Conn. 294; Doughty v. S. & E. R. R. Co., 1 Zabr. 442; Swan v. Williams, 2 Mich. 427.

The right of the public to have their grinding done at a public grist-mill, is also a *public use*, within the meaning of that term, which we have no disposition to gainsay. Harding v. Goodlet, 3 Yerg. 41; Stowell v. Flagg, 11 Mass. 364; Boston & R. M. D. Cor. v. Newman, 12 Pick. 467; Burgess v. Clack, 13 Ire. 109; McAfee v. Kennedy, 1 Lit. 92; Smith v. Connelly, 1 Mon. 58; Shackleford v. Caffey, 4 J. J. Mar. 40.

There are many other uses, obviously public, which every one will concede. Army supplies in time of war, public highways, sites for public buildings, streams and lands for an adequate supply of water for the use of a city, &c., are of this acknowledged class.—Lumbard v. Stearns, 4 Cush. 60; Stein v. Burden, 24 Ala. 130; Benedict v. Goit, 3 Barb. 459; Burden v. Stein, 27 Ala. 104.

The right to levy taxes, though regulated by constitu-

tional provisions, and the right to establish police and sanitary regulations, rest on a different principle. No pecuniary compensation is necessary to authorize the assertion of this class of rights. They are part of the price which the citizen pays to the government, for the protection which that government affords him.—Sedg. on Stat. and Con. Law, 501, *et seq.*

We will recur to this subject again.

How is it to be determined, when the legislature authorizes the taking of private property, whether or not the use is public within the 13th section of the bill of rights? We have shown the principle on which the right is vested in the legislature to decide, under section 1, what constitutes public services. That principle has no application here.

In Sedg. on Stat. and Con. Law, pp. 512, 513, is the following language: "As the power to take is universal, so it is absolute; that is to say, the legislature are the sole judges of the existence of the exigency which demands the sacrifice of the rights of individuals. 'I admit,' says Mr. Chancellor Walworth, 'that the legislature are the sole judges as to the expediency of exercising the right of eminent domain for the purpose of making public improvements, either for the benefit of the inhabitants of the State generally, or of any particular section thereof.' 'It is the undoubted and exclusive province of the legislature,' says the supreme court of the State of Maine, 'to decide when the public exigencies require that private property be taken for public uses.'"

An examination of the very brief extracts by Mr. Sedgwick, from the opinions of Chancellor Walworth and the chief-justice of Maine, will show that he misapprehended what they had decided. The apparent import of Mr. Sedgwick's language, as we understand it, is, that the legislature are the sole judges of what is a public use, which will justify the taking of private property. He had advanced the same idea, though in different language, on page 511 of his work. Chancellor Walworth said, "The *expediency* of exercising the right of eminent domain, for the purpose of making public improvements," &c.

This language may be thus paraphrased, without changing its meaning: *The right of eminent domain, for the purpose of making public improvements, being clear, the legislature are the sole judges of the expediency of exercising this admitted right.* The case was one of undoubted public use, and the entire·opinion of the chancellor shows that he was speaking of the expediency of exercising the right, and not of the right itself.—See Varick v. Smith, 5 Paige, 137, 160.

The case of Spring v. Russell, 7 Greenl. 273, 292, also cited by Mr. Sedgwick, arose under an act of the legislature, chartering a canal company. Under many decisions, this use was also public. The principle settled was precisely analogous to that declared by Chancellor Walworth.

Mr. Sedgwick cites two other cases; Woodruff v. Fisher, 17 Barb. 225, and Hartwell v. Armstrong, 19 Barb. 166. Each of these presented a case of sanitary regulation, which was clearly within the constitution. We feel justified in declaring that Mr. Sedgwick, as we understand him, is not sustained by either of the authorities he cites. See Parham v. Justices, &c. 9 Geo. 341.

But let us inquire if such construction is not repelled by the very nature of the question. As we have shown above, this clause in our bill of rights was incorporated into the fundamental law, because it was feared that all the departments of the government might fail or be unable to protect the citizens in the rightful enjoyment of their property. It implied no distrust of one department more than another, but a jealous watchfulness of individual rights, and a prudent apprehension, based on the melancholy examples furnished by the experience of mankind, that unbridled power is too apt to merge individual right in national strength and greatness. The oppressions, then fresh in their recollection, which had forced our ancestors to sever all political connection with the mother country, had taught them that the surest and best mode of installing and preserving a noble government was to enfranchise and ennoble the people, whose virtue and happiness should be the first object of all rational government.

The section of the bill of rights we are discussing being intended as a protection to the citizen against abuse of power by the different departments of the government, of what avail can it be under the rule laid down by Mr. Sedgwick? The constitution is, in theory, a law to the legislature. It controls that body as absolutely as it controls the other departments of the government. How can that control be exerted or made available, if the legislature is the sole judge of the extent of its power? Would not this be to render the legislature omnipotent? Would it not be to deny to the constitution all coercive restraint over the legislature, and leave it a mere instrument of moral suasion? Such a construction would forbid that we should regard the constitution as the supreme law of the land, and would substitute that other sentiment, that the constitution, *as expounded by the legislature,* is the supreme law of the land. It would clothe the legislature with the absolute power of construing, as well as enacting statutes, contrary to the letter and spirit of our constitution.—See Mobile & O. R. R. Co. v. The State, 29 Ala. 573; McKoan v. Devries, 3 Barb. 196; Harness v. O. & C. C. Co., 1 Md. Ch. Decis. 249.

Another argument: If it be true that the legislature are the sole judges of what constitutes public use within the purview of our bill of rights, then it would seem to follow, that whenever the legislature confer the right to take or condemn property for a specified purpose, they need not superadd the declaration that such purpose is a public use. Having the power to take only for public use, it would seem, in all correct reasoning, to follow that the exercise of the power by them would be the assertion that the use was public; otherwise, they would not have the constitutional authority to so act. See authorities to this effect in opinion of the writer of this opinion, in Ikelheimer v. Chapman, 32 Ala. 676.

If the view expressed above be correct, then it follows necessarily that no court could pronounce such legislation unconstitutional, unless the law-making power should pursue the unheard-of course of declaring that the act they were performing, though in form legislative, was in reality

unconstitutional and void. That such is not the rule—nay, more, that the legislature cannot, by its own mere declaration, convert a private into a public use—is proved by all the decisions of courts which have held certain acts of this kind to be unconstitutional. We have cited several cases, in which the court ruled the statutes to be unconstitutional. We hereafter cite others.—See Gardner v. Trustees, 2 Johns. Ch. 162.

Every officer in the government, from the executive to the humblest magistrate, is charged, to the extent of his sphere, with the preservation of constitutional rights.

If it be contended, as was asserted by Chief-Justice Gibson, (see Harvey v. Thomas, 10 Watts, 63,) that inasmuch as the constitution expressly qualifies the taking of private property *only* when the use for which it is taken is public; and that this, by implication, permits private property to be taken for *private* use, the answer is that the argument proves too much. If the word public was inserted in the constitution simply as a qualification of a general and otherwise universal right in the government to take private property, the inevitable sequence from such construction is, that this universal right to take is not even restrained by the constitutional indemnity of compensation to the owner for his private property thus taken. If this argument be sound, private property may, by the exercise of legislative discretion, be taken without limitation; and the owner, whose estate is thereby despoiled, can claim and expect nothing in the form of compensation.

Another, and perhaps more valuable provision of our constitution, declares that the citizen shall not be deprived of his "property, but by due course of law." Without intending, at this time, to define the full meaning of the constitutional phrase, *due course of law*, it evidently does not mean a transfer of property by mere legislative edict, from one person to another. Nor will the usurpation be healed, by bringing a judicial tribunal to sit as a passive witness to the ceremony. The *due course of law*, by which a citizen may be deprived of his property, is something

more substantial than this.—Dorman v. The State, at the present term.

We feel fully justified in laying down the following rules :

1. The legislature cannot, either with or without compensation, take private property for private use.—1 Bl. Com. 139; B. & L. R. Cor. v. S. & L. R. Co., 2 Gray, 137; Taylor v. Porter, 4 Hill, 140; Embury v. Connor, 3 Coms. 511; Ten Eyck v. D. & R. C. Co., 3 Harr.·200; Varick v. Smith, 5 Paige, 137; Parham v. Justices, &c. 9 Geo. 341; Hall v. Boyd, 14 Geo. 1; 13 Ark. 198; Wilkinson v. Leland, 2 Pet. 657.

2. When a use is public, the legislature are the sole judges of the expediency of authorizing the taking of private property for that public use. The court can not take the account, for the purpose of determining whether the *public use* in the particular case furnished an adequate consideration to uphold the authority to take, conferred by the legislature.—See authorities *supra.*

3. Certain uses and purposes are *per se* public, such as public highways, public buildings, and the improvement of the channels of public rivers. Others have been pronounced public, by well considered decisions, as railroads, turnpike-roads, public ferries, public grist-mills, &c. All these, and perhaps many more, the court will judicially know are within the authority left in the legislature by the 13th section of the bill of rights.—See authorities *supra.*

We do not say that the legislature may not declare other uses to be public, or provide the means of testing before some competent tribunal, and upon appropriate proceedings, the question whether there may not be other *uses,* of such general interest to communities, as, upon such finding, to justify a judgment or sentence of the court that the use is public, and justifies the condemnation of private property to a reasonable extent, in the securing of such use. The State is probably interested in the encouragement of industrial pursuits; in reclaiming its waste lands; in leaving its citizens in position to perform public service. Whether these considerations

justify or call for legislative interposition, it is not for us in the first instance, but for the legislature, to determine. Their power, unlike ours, is bounded alone by the constitution. We have no authority to say what the law should be, but only to expound and apply it as we find it.—Barrow v. Page, 5 Hay. 97; Harding v. Goodlet, 3 Yerg. 41; Stark v. McGowen, 1 N. & M. 387; 1 Bald. 220; O'Hara v. Lexington & R. R. Co., 1 Dana, 232; Pitzer v. Williams, 2 Rob. Va. 241.

We do not now decide, whether the compensation must be paid before the act of taking or condemning private property is perfected. The subject is treated in the subjoined authorities. They will be seen to be in conflict. Some of the diversity is attributable to the varying phraseology of the constitutional provisions. Some countenance is given, in some of the adjudged cases, to the idea that when the condemnation is for a purpose literally public—cases in which the State, county, or some municipal corporation must pay or make compensation, then it is enough to provide for after-payment.

We repeat, we do not affirm that our constitution demands pre-payment. Still we would think that legislation unguarded, which, at the instance of a private applicant, divested out of the citizen the title to his lands, or to a permanent easement therein, until compensation had been actually paid to him. Such seems to be the rule declared by the Code, in one of the cases under discussion: §§ 2089, 2090, 2091, 2092, 2105.—See Burden v. Stein, 27 Ala. 104; Pierce Am. R. R. Law, 161—2, *et seq.;* Beekman v. S. & S. R. R. Co., 3 Paige, 45, 73; Bloodgood v. Mohawk & H. R. R. Co., 18 Wen. 9; People v. Supervisors, 4 Barb. 64; Thatcher v. D. Bridge Co., 18 Pick. 501; Young v. McKenzie, 3 Hill, 31; TenEyck v. Del. & Rar. Canal Co., 3 How. 200; Harness v. C. &. O. Can. Co., 1 Md. Chy. Dec. 248; Cushman v. Smith, 34 Maine, 247; Doughty v. L. & E. R. Co., 3 Halst. 51; 1 U. S. Dig. 560, §§ 139, 140; Gardner v. Trustees, 2 Johns. Ch. 162; Donnahu v. State, 8 Sm. & M. 649; Smith v. Holmes, 7 Barb. 416; McCormic v. Town of L., 1 Smith, 83; Rice v. D. L. & N. T. Co., 7 Dana, 81; see, also, 6 Barb. 209; 6 Geo.

130; 3 Kelly, 31; 3 Gratt. 270; 14 Conn. 146; 26 Wen.. 485; 3 Watts & Serg. 460; 3 How. Mis. 240; 1 Bald. 205; 4 Wash. C. C. 601; 1 N. H. 339; Wright, 132; 4 Blackf. 505; 1 Penn. State R. 309; Wallace v. Karlenowefski, 19 Barb. 118.

The authority to lay out the road, which is the subject of controversy in the case of Sadler v. Langham, rests on sections 1187, 1188 of the Code. Until 1832, there seems to have been no legislative authority for the establishment of private roads in Alabama. In 1832 an act was passed, the first section of which authorized the establishment of private roads. The provisions of that section, and of sections 1187, 1188 of the Code, are substantially alike. Under an irresistible implication, springing out of the language employed in each of these statutes, there was an attempt made to confer authority to take the private property of some person or persons, other than the applicant, as a track for such road. This is a taking of private property. Is the use public? The statute speaks alone of private roads. They are to be opened and kept in repair at the expense of the applicant, and he alone is to make compensation to the owner of the land over which it passes. Their burdens are to to be borne by him, and for their performance he can claim no exemption from work on public roads. We think it clearly appears that these uses are simply private; and there is nothing in the statute which authorizes public travel on such private roads. So far as the statutes assume to give authority to lay out such road over the lands of another without his consent, the statute is unconstitutional. In this we are sustained by a divided preponderance of authority.—Taylor v. Porter, 4 Hill, 140; Clark v. White, 2 Swan, 540; Brewer v. Bowman, 9 Geo. 37; Am. Print Works v. Lawrence, 3 Zabr. 590.

We are aware that, in one case, a private road was established under the act of 1832, and this court declared the proceedings to be regular. The constitutional question, however, was not considered, and we do not feel bound by the result.—Long v. Com'rs, 18 Ala. 482.

The authority claimed to erect the dam, which is the

subject of contest in the case of Moore and Wife v. Wright & Rice, is based on the Code, sections 2089, 2091, 2092, 2093, 2104, 2105.

Our first statute on this subject was passed in 1811. Toul. Dig. 623. It related alone to the erection of water grist-mills which grind for toll, and which it declared to be public mills. The next statute was passed in 1812. Toul. Dig. 624; Clay's Dig. 376–7–8. The act of 1812 provided for the erection of dams for water grist-mills, saw-mills, cotton-gins, and other useful water-works, where the applicant owned lands on one side of the water-course. It gave authority to condemn one acre of land on the opposite bank, for an abutment for such dam. The law of this State, on any question affecting this case, was not changed until the Code became operative.

The Code (§ 1112) declares, that "all grist-mills which grind for toll, are public mills." .

The Code authorizes any person who is owner in fee simple of the land on one side, and part of the bed of a water-course which is not a navigable stream, and who proposes to erect a *mill or other machinery*, to have one acre of the land, including the opposite bank of the water-course, condemned to the use of such mill or other machinery, upon making compensation to the owner. It is obvious that this enactment includes the case of a water grist-mill, which grinds for toll, and which, we have seen, is a *public use* which authorizes the taking of private property. It is equally obvious that the Code employs no term which designates or specifies a public water grist-mill, as within its provisions. It is embraced in the generic term mill. All other mills and all other machinery, propelled by water-power, no matter how private or exclusive the use, are as plainly embraced within the language of the enactment, as are water grist-mills which grind for toll. The principles we have laid down above, forbid the taking of private property without the consent of the owner, for the erection of mills or other machinery whose use is purely private. We have, then, the case of a statute, which, in the employment of a generic phrase, without expressing the different species included in that

genus, attempts, by words not separable, to confer a general authority, a part of the patent objects of which are within, and others without the pale of constitutional power. In such case, we have no discretion but to pronounce the entire clause unconstitutional.—See Mobile & Ohio R. R. v. State, 29 Ala. 573.

This precise question arose under the New York liquor law, in a case which enlisted the best talents, legal and judicial, which adorn that State. One section of their statute prohibited the sale of liquors, save for a qualified use, and made no discrimination between liquors purchased before the statute was enacted, and those acquired afterwards. The court were inclined to hold that, as to purchases made after the statute became operative, no principle of their constitution was infringed. But, inasmuch as the same clause was designed to operate, and did operate, alike upon property then owned and that which should be acquired afterwards, the court, coming to the conclusion that said clause was, as to prior purchases, unconstitutional, pronounced the whole clause unconstitutional and void.—See Wynehamer v. The People, 3 Ker. 378; State of Ohio v. Com'rs of Perry County, 5 Ohio State, 497; Campbell v. Miss. Union Bank, 6 How. Miss. 625, 677; Bank of Hamilton v. Dudley, 2 Pet. 492, 526.

For a discussion of kindred questions, examine Pettit v. Pettit, 32 Ala. 288; Harding v. Goodlet, 3 Yerg. 41.

It may be urged, that these statutes have stood, and been silently acquiesced in for so great a length of time, they should not now be disturbed. We are sensible of the force of this argument. It will be observed, however, that in Tennessee, the decision which declared the private road law unconstitutional was pronounced forty years after the enactment of the statute; and in New York, after seventy years had elapsed. It is, perhaps, never too late to re-establish constitutional rights, the observance of which had been silently neglected.

We are not unmindful of the inconvenience which must ensue from the enunciation of these principles. The remedy is not with us, but with the legislature, save as that body, in common with this, is under constitutional

restraints. We adopt as our own the following language of one of New York's ablest and purest judges:

"It is highly probable that inconveniences will result from following the constitution as it is written. But that consideration can have no weight with me. It is not for us, but for those who made the instrument, to supply its defects. If the legislature or the courts may take that office on themselves, or if under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set a boundary to the powers of the government. Written constitutions will be more than useless.

"Believing, as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring power—some evil to be avoided, or some good to be attained, by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined, and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But, if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary, in enlarging the powers of the government, opens the door for another, which will be sure to follow; and so the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them."—Oakley v. Aspinwall, 3 Comstock, 547, 568.

The case of Sadler v. Langham is strictly a private suit. It was set on foot and prosecuted for the private accommo-

dation of M. M. Langham and H. T. Burge. They must pay the costs incurred in the several courts.

W. G. Sadler ⎫ From the Circuit Court of Greene
*v.* ⎪ County.
M. M. Langham, ⎬ Ordered by the court, that the judg-
H. T. Burge. ⎭ ment of the circuit court be reversed; and this court, proceeding to render such judgment as the circuit court should have rendered, doth hereby order and adjudge, that the proceedings had in the court of county commissioners of Greene county be, and the same are hereby quashed.

L. C. Moore and Wife⎫ *From the Probate Court of
*v.* ⎬ Lauderdale County.
Wright & Rice. ⎭ The judgment of the probate court is reversed, and this court, proceeding to render such judgment as the probate court should have rendered, doth hereby order and adjudge, that the proceedings in the probate court be, and the same are hereby quashed.