# WHEELING.

## VARNER v. MARTIN.

Submitted June 13, 1882—Decided April 21, 1883.

(*WOODS, JUDGE, Absent.)

1. Under our Constitution private property can not be taken with or without compensation for *private* use.   (p. 548.)

2. Under our Constitution private property can be taken only for *public* use, and then only upon just compensation being paid or secured to be paid.   (p. 551.)

3. Whether private property should be taken for the direct and immediate use of the public is a question for the Legislature to determine, and when so taken and used, the title of the property condemned is not transferred to a private individual or corporation, but remains in the public directly. The courts can not sit in judgment upon the public exigencies, which demand this exercise of the right of eminent domain ; this being in such case solely a question for the Legislature.   (p. 552.)

4. Hence a public highway under the direct control of the public, and kept in repair by it, and which no individual can obstruct without being liable to punishment, may if the Legislature by law so authorize, be established, though it leads only from a public road to the dwelling or farm of a single person. If the power conferred on a county court to open such public highway be general, no limitation of this power will be placed by the courts because of the degree of accommodation, which such public road may afford to the public at large. That is a matter in such case, which addresses itself not to the authority, but to the discretion of the county court.   (p. 553.)

*Case submitted before Judge W. took his seat upon the bench.

5. But if the title and control of the property to be condemned is to pass into the hands and under the control of a private person or corporation, so that they are to have it as their private property, whether the public is to have such a use of or in such property as will justify the exercise of the power of eminent domain, is a question for the courts to decide. Though if a particular use of it be declared by the Legislature to be a public use, the courts will hold such use to be public unless it manifestly appears, that it is not a public use. In such cases, what is a public use, is a question for the courts to determine.   (p. 555.)

6. In such a case, where the title and control of the property to be condemned is in private hands or in a corporation, three qualifications are necessary to impose upon it such a public use as will justify the taking of such private property without the consent of the owner.   (p. 556.)

7. The use, which the public is to have of such property, must be fixed and definite. The general public must have a right to a certain definite use of the private property on terms and for charges fixed by law ; and the owner of the property must be compelled by law to permit the general public to enjoy it. It will not suffice, that the general prosperity of the community is promoted by the taking of private property from the owner and transferring its title and control to another, or to a corporation to be used by such other or by such corporation as its private property uncontrolled by law as to its use. Such supposed indirect advantage to the community is not in contemplation of law a public use.   (p. 556.)

8. This use of the property, which in such case the public must have, must be a substantially beneficial use, which is obviously needful for the public to have, and which it could not do without except by suffering great loss or inconvenience.   (p. 557.)

9. And when the title of property is thus transferred by condemnation to an individual or to a corporation, the necessity for such condemnation must be obvious. It must obviously appear from the location of the property proposed to be condemned, or from the character of the use, to which it is to be put, that the public could not without great difficulty obtain the use of this land or of other land, which would answer the same general purpose, unless it was condemned. And in such case, the courts will judge of the necessity for confirming such condemnation.   (p. 558.)

10. A road must be deemed to be a private road, when its control is not under a public officer, and the public is not bound to work it or keep it in order, and where an individual might obstruct its use without being guilty of any public offense.   (p. 560.)

11. The Legislature can not authorize the condemnation of land to

establish such private road, even though the general public welfare of the community might be promoted by the forcible opening of such private roads. On the principles above laid down the public have no such direct and tangible use of such roads, as would justify the courts in regarding it as a public use, even though the public might have a right to use such private road, while it was permitted to be kept open, or while the person for whose use it was opened chose to keep it in repair. (p. 561.)

12. Section 44 of chapter 194 of the Acts of 1872-73, which is taken from sec. 38 of ch. 43 of the Code of West Virginia authorizes the condemnation of lands to establish such private roads, and it is therefore unconstitutional, null and void. (p. 564.)

Writ of error and *supersedeas* to a judgment of the circuit court of the county of Harrison, rendered on the 6th day of June, 1881, dismissing a *supersedeas* to a judgment of the county court of said county in an action wherein A. J. Varner was plaintiff, and Lehi Martin was defendant, allowed upon the petition of said Varner.

Hon. A. B. Fleming, judge of the second judicial circuit, rendered the judgment complained of.

GREEN, JUDGE, furnishes the following statement of the case :

Lehi Martin filed his petition in the county court of Harrison county stating, that he owned a valuable tract of eighty-nine acres on the right hand fork of Jacob's run, to which he had no access by road public or private rendering it thus almost valueless to him; that a road about a quarter of a mile in length could be made to it, connecting it with a public road at a point near A. J. Varner's residence; that such proposed road would pass only through the lands of Varner and one John C. Isenhart. He asks, that they may be made parties defendant to the petition; that this road be opened, and that it may be a private road with gates where necessary, and that the court will appoint three commissioners, whom he names to view it and report the advantages and disadvantages of the same to the parties to this petition as well as to the public; and all the necessary facts in reference to it; and whether it would be necessary to take any yard, garden or curtilage or any part thereof, or injure or destroy any

building; the names of the land owners, whose property would be taken or injured; which of them require compensation, and the probable amount to which each of them may be entitled; and the petition asks, that these viewers return with their report a map of the route of the road.

These viewers were appointed by the court on June 14, 1880, the order says on motion of Lehi Martin, who were directed "to view and make a way for a private road, beginning at the public road at or near the dwelling-house of A. J. Varner on Jacob's run, and running through the lands of A. J. Varner and John C. Isenhart to a point on the land of Lehi Martin, and make report to the court on June 16, 1880, according to law." No reference is made in this order to the petition of Martin. They made their report accordingly, and the court on June 17, 1880, ordered Varner and Isenhart to be notified to appear on the first day of the next term to show cause against the establishment of this road.

These viewers reported, that in making this road it would not be necessary to take any yard, garden or any part thereof of Varner's land, though it does pass near two small apple trees out of ten recently planted, nor would the road injure or destroy any building on his land or on the land of John C. Isenhart, nor does it take any yard, garden or orchard or any part thereof on his land; and these are the only land owners on the proposed road. The proposed width of the road is twelve feet; its length through Varner's land is eighty-five and one half poles, and through Isenhart's land its length is twenty-four and one half poles. Isenhart claimed no damages. Varner claimed one thousand dollars, but the viewers estimate his damages at twenty-five dollars. They state, that the road will not cut up his fields nor throw them into irregular shape, as it follows through his land a fence already built, and only two gates will be necessary on his land if gates are used. A diagram is returned with this report, which concludes: "This proposed road we deem absolutely necessary to enable Lehi Martin to obtain the use or benefit of the tract of land of about ninety acres to which it leads, but this road will be of no advantage to the public except as it enables Mr. Martin to have ingress and egress to his land, and will thus be of great advantage to him."

68

On the 14th of August, 1880, after the return of this report this order was made by the court:

"This day came the applicant, Lehi Martin, by his attorney, and the contestant, A. J. Varner, in person, and the court having seen and inspected the report of the viewers, to which there were no exceptions, and having heard the evidence adduced, are of opinion that the road, as viewed and marked in the plat and report of said viewers filed in this cause, is necessary to enable the said Lehi Martin, the applicant, to reach and enjoy his own property, and that the grading of the same will not render any additional fencing necessary.

"And it further appearing to the court that John C. Isenhart, the other land owner through whose land said road passes, requires no compensation and does not object thereto, and that the sum of twenty-five dollars, the damages assessed by said viewers, is a just compensation to said Varner for the land proposed to be taken for said road, it is therefore ordered that a private road through the lands of said Varner and Isenhart, as viewed and marked out by said viewers and laid down on the plat filed with and accompanying their report in this cause, be granted the said applicant his heirs and assigns upon the payment to the said Varner of the sum of twenty-five dollars, the damages assessed as aforesaid, but upon this condition further, that said applicant shall erect and keep in good repair four gates on said road at the points on the plat filed by said viewers, designated by the letters 'A' and 'B,' 'C' and 'D,' and that the said applicant pay the costs of this proceeding and the expense attending the opening of said road."

And on the same day this order was entered:

"Lehi Martin, the applicant, this day paid into court with the consent of the court, ($25) twenty-five dollars, the damages assessed by the viewers and fixed by the court as compensation to him for the land proposed to be taken and for damages for the private road granted said Martin through the land of the said Varner and Jno. C. Isenhart, said Varner refusing to accept the same when tendered him by the said Martin. And the said Varner moved the court to award a writ of *ad quod damnum*, which motion for said writ is by the

court overruled, to which ruling of the court—refusing to grant the writ of *ad quod damnum*—the said Varner excepts and tenders his bill of exceptions, which is signed, sealed and made a part of the record."

The bill of exceptions was accordingly taken and signed and sealed by the members of the court. A. J. Varner obtained a writ of error and *supersedeas* to this order of the county court establishing this road. The circuit court of Harrison county on the 6th day of June, 1881, affirmed the judgment of the county court and ordered, that the plaintiff in error, Varner, do pay to the defendant in error, Martin, his costs in that court expended. Upon the petition of A. J. Varner a writ of error and *supersedeas* has been awarded him to this order of the circuit court of Harrison county.

*Stuart & Blair* for plaintiffs in error cited the following authorities : Cons. of W. Va. art. 3 §§ 9, 10, 13; 4 Ohio St. 497; 7 W. Va. 191; 24 Wis. 89; (S. C. 1 Am. Rep. 161); 17 W. Va. 812; 43 Ind. 455; (S. C. 13 Am. Rep. 399, note 404); 66 N. Y. 569; (23 Am. Rep. 86); 44 Vt. 648; (S. C. 8 Am. Rep. 398); 35 Mich. 333; (S. C. 24 Am. Rep. 564); 3 Yeager, 41, 52; *Clack* v. *White*, 2 Swan. 540; 4 Cold. 419; 4 Ohio St. 253; 7 *Id.* 2 pt. 111; 39 Ill. 110; *Crear* v. *Croply,* 40 Ill. 175; 2 Johns. Ch. 463; S. C. 7 Am. Dec. 548; 17 Ohio 340; 9 W. Va. 703; 5 W. Va. 57; Acts 1872–3, ch. 194, §§ 35 to 44 inclusive; Cons. of U. S. art. 7 of Amendments.

*John J. Davis* for defendant in error cited the following authorities: Acts 1872–3, ch. 194 § 35; *Id.* § 37; *Id.* § 39; *Id.* § 44; *Id.* § 38; 3 Paige Chy. 45; 1 Sax. Chy. 694; 2 Kent. Com. 13; Potter's Dwar. Stat. 395; 3 Leigh 675; 5 Gratt. 265 ; 7 W. Va. 191; 4 Har. 580; 9 Ga. 37; 12 Bush. 21; 108 Mass. 202; 42 N. H. 348; 18 N. J. Eq. 54; 2 Nott & McC. 526; 16 Pa. St. 15; 77 Pa. St. 39; 84 Pa. St. 90.

GREEN, JUDGE, announced the opinion of the Court :

The question in this case is, whether on the facts appearing in the record the county court of Harrison rightfully condemned the land of the plaintiff in error, A. J. Varner, to establish the road through it which they did establish by

the order of August 14, 1880. Several objections are urged by the counsel of the plaintiff in error to the manner, in which this condemnation was made, such as that the viewers were appointed not on the petition of the applicant for this private road, but on his motion only; and that after the approval of the report of the viewers the plaintiff in error asked *a writ of ad quod damnum* to assess his damages, which the court refused to grant him, and fixed his damages themselves as the amount reported by the viewers, without giving him his constitutional right to have them ascertained by a jury of twelve freeholders. But underlying these questions is the far more important one, whether under our Constitution and laws upon the facts appearing in this case, could this road have been established, even if the proceedings had been in all respects regular, and the legislation as to the modes of proceeding had been entirely unobjectionable.

The determination of this question will depend upon the constitutionality of section 44 of chapter 194 of the Acts of 1872–73, pages 575 and 576 which is: "Upon hearing the parties interested in an application for a private road, the court shall grant such private road if it be made to appear, that the same is necessary to enable the applicant to reach and enjoy his own property, and that the granting thereof will not entail irreparable injury upon the party through whose lands the same will run. If the granting of such road shall render any additional fencing necessary, it shall only be granted upon condition, that the applicant shall at his own expense build and keep in good repair all such fences for such length of time as he shall use such private road. And upon the payment of the damages assessed therefor, and the completion of the fences aforesaid, if any, the applicant, his heirs or assigns shall have the free use and enjoyment of the said private road to the same extent as if it were a public road, so long as he and they shall comply with the conditions, if any, upon which it was granted."

This section is a copy of the last half of section 38 of chapter 43 of Code of West Virginia page 275 excepting, that it confers the power of establishing such private road on the county court in lieu of the board of supervisors, which had been abolished. And this provision in our Code with refer-

ence to the establishment of private roads, as well as all
other provisions in chapter 43 of the Code of West Virginia
with reference to private roads and the modes of proceeding
to have them established, were for the first time adopted by
this State when the Code of 1868 went into operation.
Neither the State of Virginia nor this State had ever, prior
to that time, adopted any law authorizing the establishment
of private roads by public authority.   It was an innovation
on what had been the long continued legislative policy of the
State of Virginia and of West Virginia, and was taken from
a policy, which had been for a long while adopted in certain
northern States.   All the provisions of the Code of West
Virginia in reference to private roads, contained in chapter
43 of said Code relative to private roads are transferred to
this chapter, 194 of the Acts of 1872–73, except that the
powers with reference to private roads contained in the Code
of West Virginia are transferred to the county court with-
out change or alteration.   But this chapter 43 of the Code
of West Virginia, which for the first time introduced in
this State any provisions with reference to private roads
was revised, amended and re-enacted by chapter 14 of the
Acts 1881.   See session Acts of 1881 p. 152.   And in this
re-enactment all the provisions of chapter 43 of the Code
of West Virginia in reference to private roads, were omitted,
thus in this respect restoring the law to what it had always
been prior to our Code, both in this State and Virginia.

Is this section 44 of chapter 194 of Acts of 1872–73 p. 575,
576 in violation of our Constitution?   This private road was
established by virtue of this section, and if it be unconstitu-
tional and void the judgment of the county court of Harrison
of August 14, 1880, should have been reversed and set aside
by the circuit court.   But that court having affirmed it, the
judgment of the circuit court must be reversed by this Court,
even had all the provisions of chapter 194 of Acts 1872–73
been fully complied with.   And therefore, if this forty-fourth
section of this act be unconstitutional, it is unnecessary to
inquire into the regularity of the proceedings in this case.
Neither this nor any other legislative enactment should be
declared unconstitutional and void unless it *be clear*, that the
legislature has transcended its authority.

In some cases it has been said, that before the courts declare an act of the Legislature void it should be shown to be unconstitutional *beyond all reasonable doubt.* Perhaps this really means no more than we have said, that before declaring an act of the Legistature void its unconstitutionality should be *clear* to our minds. But the use of this phrase *beyond all reasonable doubt* seems to me to be very inappropriate in such a connection, and to be well calculated to produce mischief. It is a phrase which has long been appropriated to express the character of the evidence necessary to convict a criminal, and has so often in this connection been perverted from its proper meaning by counsel defending criminals, that it is almost impossible to prevent its making a false impression on the mind when it is applied to other subjects, to which the phrase as so used is inappropriate. Perhaps no harm results or at least no very serious harm from the overstrained meaning given to this phrase by criminal lawyers; all the harm resulting in such case is, that now and then by perverting the true meaning of this phrase a criminal is acquitted, who should have been condemned. However this cannot be regarded as a very great evil when it is borne in mind, that it has been said, that it is better that ninety-nine guilty persons should escape than that one innocent person should be condemned. But not so with the question before us. It is not better, that the Constitution should be violated ninety and nine times by the Legislatre than, that the courts should erroneously hold one act of the Legislature unconstitutional. We cannot raise presumptions in favor of legislative infallibility as strong as those of a jury in favor of the innocence of a prisoner charged with murder.

The framers of our Constitution presumed, that the Legislature might err in transcending its constitutional powers, and hence they inserted in the Constitution limitations on their powers, which it is the duty of this Court to see are observed. These provisions have been inserted in our Constitution for protection of the life, liberty and property of the citizens against encroachments, intentional or otherwise. We cannot believe that it is our duty to raise presumptions against the citizens and in favor of the Legislature to the extent, that a jury in trying one for murder raise presumptions

in weighing the evidence in favor of the accused.   We admit, that it is our duty not to hold void an act of the Legislature unless we are satisfied, that it is clearly unconstitutional. But if after approaching the question involved in this case with great caution and delicacy, as is our duty, and if after a careful examination we are satisfied, that this section 44 of chapter 194 Acts 1872–73 is *clearly* unconstitutional, it is our duty to unhesitatingly so declare, and we would not be properly discharging our duty if after reaching this conclusion we should resort to unnatural constructions either of the Constitution or of the law, on which to base a doubt whereby the law might be upheld, as a jury might do if one was being tried for murder.   In no other manner can we properly perform the duty, which to a certain extent is imposed on us of protecting and preserving the inalienable rights of the citizens.   While we concede, that it is the duty as it doubtless is the pleasure of both the legislative and the judicial departments of the government to presume, that the other will keep within the bounds of constitutional authority, yet, that presumption is not only not conclusive, but it is not so strong as to prevent a free and full enquiry into the subject; nor should we in the indulgence of this presumption forget that there is committed to us, equally with the legislative department of the government, the trust of guarding and protecting the life, liberty and property of the citizens as guaranteed by the Constitution.   My views on this question are well expressed by Judge Stone in the case of *Sadler* v. *Langham*, 34 Ala. p. 321, 322.

The main question in this case brings up the interpretation to be given to the ninth section of article 3 of our Constitution, our bill of rights, which is:   "Private property shall not be taken or damaged for public use without just compensation, nor shall the same be taken by any company incorporated for the purposes of internal improvement, until just compensation shall have been paid or secured to be paid to the owner; and when private property shall be taken or damaged for public use or for the use of such corporation, the compensation to the owner shall be ascertained in such manner as shall be prescribed by general laws.   Provided, that when required by either of the parties such compensa-

tion shall be ascertained by an impartial jury of twelve free-holders." See Acts of 1872–73 pages 6 and 7. First, what is meant in this section by the words "for public use?" Second, in what manner and by whom is it to be determined whether the proposed use, for which the property is to be taken, is "a public use?" Third, the prohibition being express only against taking the property of another for "public use," can such property be taken for "private use?" There is much conflict among the authorities upon the first and second of these questions.

This section tacitly recognizes the right of eminent domain. This right attaches as an incident to every sovereignty, and it constitutes a condition, upon which all private property is held. Whenever the public use of property requires it, the private rights to property must yield to this paramount right of sovereign power to take it for the public use. When so taken it is the character of the use, for which the property is taken and not the means or agencies by which it is taken, which determines the question whether it is legally taken under the legitimate exercise of this right of eminent domain. This right may be exercised directly by the statute or by agencies appointed by it, or as is the most common mode, by persons or corporations authorized by the Legislature to exercise it in modes prescribed by law. But its exercise can be and should be restrained whevever its legitimate limits have been exceeded, or when the Legislature has either abused or perverted the power. Of course this right to appropriate private property for public uses must lie dormant in the State, until the Legislature by law points out the modes, conditions and agencies whereby the appropriation can be made.

It is difficult to define all the cases, which the courts would hold to be "public uses" within the meaning of this section of our Constitution, but we may form a better idea of what is meant by the phrase, "public uses," by ascertaining what the courts and especially what the courts of Virginia prior to our separation, and the courts of this State have since had occasion to hold to be a *public use of* property.

Anciently the most usual occasion on which the State ex-

ercised this right of eminent domain was by its authorizing persons owning mill sites and desiring to build a water grist-mill where it was necessary to abut his dam on the land of another, or when the lands of others would be overflown, to condemn land for such purposes and uses. This mode of proceeding for acquiring lands for the building of such water grist-mills was regulated by statutes, which were passed at a very early period, even prior to the year 1700. And the statutes embraced all the details, by which such lands were to be condemned. Many of these acts are referred to in the notes to ch. 235 of the Revised Code of Virginia of 1819, vol. 2. p. 225 to 232, and this chapter will show the general character of these acts. While these acts provided, that lands of others could be condemned for the erection of water grist-mills they also imposed on the owners of such water grist-mills many obligations to the general public. As examples of some of these duties so imposed on the owners of such water grist-mills, I may refer to section 6 of chapter 325 of R. Code of 1819, vol. 2 p. 227. He was thereby required to begin the building of his mill and dam within one year, and to finish it within three years so as, that it should be in good condition for public use. And if it should be destroyed, he was in like manner to commence building it within one year, and was required to finish it within three years, and if he failed in either case, the title to the land condemned reverted to its former owner; and his leave to erect the dam and mill became void. By section 10 of this act no person was allowed to take toll for the grinding of grain, unless his mill was established by order of the court under that act p. 228; and by section 11 p. 228, for grinding grain into meal such mill owners were allowed one eighth part of the grain and no more, and for grinding it into hominy or malt one sixteenth part and no more, and they were compelled at these rates to grind all grain intended for the consumption of those bringing it and their families, and to grind the same in due turn as the same should be brought. These duties were enforced under penalties. See section 12. Section 13 required them to keep on hand at their mills sealed measures, and unless he had fifty acres of land he was not allowed to keep any grain at his mill. See section 14

p. 229. Other duties were also imposed on such mill owners not necessary to be mentioned. They were also prohibited from sitting on grand juries. See R. Code 1819 vol. 1 ch. 75 § 2 p. 264. Most of these onerous duties were but the re-enactment of old statutes, which had imposed these duties on the owners of water grist-mills almost from the first settlement of the States.

The court of appeals of Virginia, while acts of this character were enforced, constantly recognized the constitutionality of such acts, and often as a matter of course where the acts were complied with, recognized the right of the owners of such mill-sites to condemn lands for the erection of such dams for such water grist-mills, and also to condemn lands to be overflown by the erection of such mill-dams. The following are some of the many cases wherein there was this silent recognition of the right to condemn lands for such purposes: *Bernard* v. *Brewer*, 2 Wash. 77 (top page 94); *Wroe* v. *Harris*, 2 Wash. 126 (top page 162); *Noel* v. *Sale*, 1 Call 495 (top page 431); *Wilkinson* v. *Mayo*, 3 H. & Munf. 565; *Coleman* v. *Moody*, 4 H. & Munf. 1; *Dawson* v. *Moons*, 4 Munf. 535; *Smith* v. *Waddill*, 11 Leigh 532; *Hunter* v. *Mathews*, 1 Rob. 468; *Mirs* v. *Gallahue*, 9 Gratt. 94.

Originally the statute laws of Virginia authorized the condemnation of lands for water grist-mills alone, but it was afterwards extended so as to include not only water grist-mills, but other machines or engines useful to the public. But the Virginia reports show, so far as I have found, no case where there has been an attempt to condemn lands for the erection of any such machine or engine, and after these statutes were extended so as to include them, the cases all show, that the condemnation of lands were made in mill cases, and with an exception of one or two cases they show, that the mills were water grist-mills, so that I think we may assume that there were no condemnations in Virginia for any sort of mills, machines or engines, other than for water grist-mills. Though no reasons are assigned in these Virginia cases, why the courts should allow lands to be condemned for making dams for water grist-mills and for lands overflowed by such dams, yet it seems to me, that the acts of the Assembly with reference to the owners of water

grist-mills disclose clearly the true ground, on which these decisions really rest; and that is, that these owners of water grist-mills were by these acts made as it were public servants. Their mills did not belong to them to the exclusion of the general public in the sense, in which any other sort of private property belonged to them. For the use of any other property, such as a saw-mill for example, the general public have no special interest of a definite character. They could charge for sawing what they pleased, or they could refuse so saw at all for any particular person, or they could let their saw-mill go down or be destroyed, and they were not compelled to rebuild. But not so with their grist-mill. In these the general public had a direct, definite and immediate interest. They could compel the owner to grind their grain at prices fixed by law, and he could not refuse to grind for any individual, but was compelled to grind for all alike in the order, in which their grain was brought to the mill. He had no choice, but as the public servant he was bound to grind in the order and for the prices fixed by law.

This was very much the same as if the general public owned the mill, and he only ground for them at a toll. Then too, if the mill was destroyed he had to build it again for the accommodation of the general public, and if he failed to do so he lost all benefit resulting from the condemnation of the land, which had been made by him, or more properly speaking, which had been made by the general public or by the State in his name. Of course these reasons would have no application to any other species of mill owner other than the owner of a water grist-mill; such other mill owner is in no sense a public servant, and the general public has no direct interest in his mill. If it be a saw-mill for example, the owner of it was not bound to saw for any one except those for whom he chose to saw, and he charges them any prices he chooses, and discontinued the use of his saw-mill whenever he pleased.

The general public had then no direct tangible interest in a saw-mill, and it would be an abuse of terms to say, that the condemnation of land for the dam of a saw-mill or for land overflown by it was a condemnation of land for a *public use*. It would be just as much an abuse of language as to

say, that the condemnation of land for a store-room or a lawyer's office was for a *public use.* In any such case of course the erection of a store or of a lawyer's office or a saw-mill might be a public convenience; but the public has no *use* of such store, office or saw-mill, has indeed no more interest in them than it has in a man's private dwelling house. Though doubtless public convenience and advantage, in a general sense, is promoted by the building of any private dwelling house in the community.

Having pointed out what I conceive to be the ground, on which the courts of Virginia have acted from time immemorial in allowing lands to be condemned for the building of dams for water grist-mills, and to condemn lands to be overflown by the erection of such dams, having shown why there does not appear in the Virginia reports any case of the condemnation of lands for the dams of saw-mills, or of any other sort of manufactory, or for lands overflowed by any other sort of dams, I propose now to examine more in detail the foundations, on which rests this right of eminent domain, this power on the part of the State to condemn private property for *public* use.

In the first place all the authorities concur in holding, that private property can never be taken without the consent of the owner for a private use only, either with or without compensation. It is true there is neither in our Constitution nor in the Constitution of the other States any express provision forbidding, that private property should be taken for the private use of another, or any constitutional provision forbidding the Legislature to pass laws, whereby the private property of one citizen may be taken and transferred to another for his private use, without the consent of the owner. It was doubtless regarded as unnecessary to insert such a provision in the Constitution or bill of rights, as the exercise of such an arbitrary power of transferring by legislation the property of one person to another, without his consent, was contrary to the fundamental principles of every republican government; and in a republican government neither the legislative, executive nor judicial department can possess unlimited power. Such a power as that of taking the private property of one and transferring to another for his own

use, is not in its nature legislative, and it is only legislative power, which by the Constitution is conferred on the Legislature. Such an act if passed by the Legislature would not in its nature be a law, but would really be an act of robbery; the exercise of an arbitrary power not conferred on the Legislature.

Other reasons have been given why such a power could not be exercised by the Legislature. In fact this ninth section of our bill of rights while it does not expressly forbid it, strongly negatives the existence of such power by implication. It assumes the right of the Legislature to take private property for *public* use, and regulates and restrains this right of the State. Surely this implies, that the far greater power to take private property for private purposes was not contemplated by the framers of our Constitution to exist in the Legislature, for if this had been contemplated is it not obvious, that some restraints on its exercise would have been inserted in the bill of rights, which was so careful of the rights of citizens as to provide, that their private property should not be taken even for public use without just compensation? and when not taken directly by the public, though taken for a public use yet, it was to be taken and the compensation to be paid was to be estimated only in the manner prescribed in the Constitution.

There is an entire concurrence of all the authorities in the proposition, that private property cannot be taken for private use, either with or without compensation. A few of the many authorities, in which this proposition is laid down as unquestionable law are here cited. See: In the matter of *Albany Street*, 11 Wend. 151; *Embury* v. *Conner*, 5 Comst. 511; *Taylor* v. *Porter*, 4 Hill (N. Y.) 140; *Beekman* v. *R. R. Co.*, 3 Paige 73; *Concord R. R. Co.* v. *Greely*, 17 N. H. 47; *Dunn* v. *Charleston*, Harper (S. C.) Law R. 189; *Bankhead* v. *Brown*, 25 Iowa 540; *Wilkison* v. *Leland*, 2 Pet. 627; *Robinson* v. *Swope, &c.*, 12 Bush. 21; *N. & L. R. Cor.* v. *S. L. R. Co.*, 2 Gray 137; *Ten Eyck* v. *D. & R. C. Co.*, 3 Harr. 200; *Variek* v. *Smith*, 5 Paige 137; *Parham* v. *Justices, &c.*, 9 Ga. 341; *Hall* v. *Boyd*, 14 Ga. 1; *Clark* v. *White*, 2 Swann 540; *Bangor R. R.* v. *McComb*, 60 Me. 290; *Heburn's Case*, 3 Bland 95; *West River Bridge* v. *Dix*, 6 How. 507; *Sadler* v.

*Langham,* 34 Ala. 311; *Pittsburg* v. *Scott,* 1 Pa. St. 309; matter of *John and Cherry Street,* 19 Wend. 689; *Cooper* v. *Williams,* 4 Ohio 253; *Buckingham* v. *Smith,* 10 Ohio 296; *Reeves* v. *The Treasurer of Wood County,* 8 Ohio N. S. 333; *Bloodgood* v. *Mohawk & Hudson R. R. Co.,* 18 Wend. 55; *Kramer* v. *Cleveland & Pittsburg R. R. Co.,* 5 Ohio N. S. 146; *Pratt* v. *Brown,* 3 Wis. 603; *N. Y. & Harlem R. R. Co.* v. *Kip,* 46 N. Y. 546; *Nesbit* v. *Trumbo,* 39 Ill. 110; *Osborn* v. *Hunt,* 24 Wis. 90; and *Tyler* v. *Beacher,* 44 Vt. 648.

Upon the question in what manner and by whom it is to be determined, whether the proposed use for which the property is to be taken is "a public use" there has been apparently some diversity of views; but I think there is but little difficulty in determining the question; the difference of opinion, which seemingly exists being really more apparent than real. This difference is really more the result of the different language used than a substantial difference of opinion. The decisions as well as reason lead to this conclusion. The Legislature by its general act declares in the first place what is a "public use," for which private property may be condemned; but in the very nature of the case this determination of the Legislature in the first instance can not be conclusive on the courts. If it were, the provision of our bill of rights, that private property shall not be taken for public uses, except on the payment of just compensation, implying as it does, that private property shall not be taken except for public use, would be of little practical value. It was intended as a protection to the citizen against the abuse of power by the different departments of the government.

This constitutional provision was more expressly intended to control the legislative department of the government. How can this control be exerted or made available, if the Legislature is the sole judge of the extent of its power in authorizing this exercise of the right of eminent domain? Would not the so holding render the Legislature omnipotent in this respect, when the Constitution shows it was deemed a dangerous power, which needed to be restrained to prevent injustice to the individual citizen? Both reason and authority leads us to the conclusion, that the existence or non-existence of a public use in any given class of cases, in which

the Legislature has authorized private property to be condemned must be determined by the courts. See *Sadler* v. *Langham*, 34 Ala. 326–329; *Tyler* v. *Beacher*, 44 Vt. 648; *New Central Coal Co.* v. *Coal and Iron Co.*, 37 Md. 537; *Parkham* v. *Justices*, 9 Ga. 341; *Channel Coal Co.* v. *Railroad*, 51 Cal. 269.

But if in a particular class of cases it be doubtful, whether the use, for which the Legislature has authorized land to be condemned, is a public use or is only private use, the leaning of the courts will be rather in favor of its being a public use, as otherwise they must hold such act unconstitutional and void, and this they will not do, as we have seen, unless the court is of opinion, that the act is clearly unconstitutional. But though where the Legislature in a particular class of cases has authorized lands to be condemned, the courts will incline to holding the use, for which such condemnation is to be had is a public use, yet, if it clearly is not, the courts will determine and pronounce the act unconstitutional nor will the courts permit a formal act authorizing condemnations to be abused, by permitting its use in condemning lands for private and not for public use. See *West Pennsylvania Inst.* v. *Edgwood R. R.* 79 Pa. 257; *Stockton R. R. Co.* v. *Stockton*, 41 Cal. 147; *Bankhead* v. *Brown*, 25 Iowa 540; *Pittsbugh* v. *Scott*, 1 Pa. St. 309.

If the use is clearly a public use, then the courts can neither restrain nor supervise the legislative authority over the subject. If the use be public it is for the Legislature to determine, whether the necessity for the exercise of this right of eminent domain exists, and the extent to which its exercise shall be carried. See *North Missouri R. R. Co.* v. *Gott*, 25 Mo. 540; *Concord R. R.* v. *Greeley*, 17 N. H. 47; *Hingham Bridge* v. *Norfolk*, 6 Allen 353; *Water Works Co.* v. *Burkhart*, 41 Ind. 364; *Challiss* v. *Atcheson R. R.*, 10 Kan. 117; *County Court of St. Louis County* v. *Griswold*, 58 Mo. 175; *Brooklin Park* v. *Armstrong*, 45 N. Y. 234; *Secombe* v. *Minn. R. R.*, 23 Wal. 108; *Weir* v. *St. Paul R. R.*, 18 Minn. 155; *Dickey* v. *Tennison*, 27 Mo. 378; *Tyler* v. *Beacher*, 44 Vt. 648; *Haverhill Bridge* v. *County Commissioners*, 103 Mass. 120; *John and Cherry Street* 19 Wend. 659; *Bloodgood* v. *Mohawk R. R.* 18 Wend. 9; *Harris* v. *Thompson*, 9 Barb,

350; *Beekman* v. *Saratoga R. R.* 8 Paige 45; *Carter* v. *Tidewater Co.* 18 N. J. Eq. 54; *Whiteman's Ex'rs* v. *Wilmington R. R.* 2 How. 514; *Northern Central Coal Co.* v. *Coal & Iron Co.* 37 Md. 537; *Bankhead* v. *Brown,* 25 Iowa 540.

When once the court has determined, that the use for which property is condemned is a public use, its judicial function is gone, and the legislative discretion is unrestrained. Whether the proposed plan will accomplish the end proposed, or to what extent it will be beneficial to the public, are not matters to be determined by the courts; these are matters belonging to the legislative discretion, and the courts are called upon to sustain and do sustain statutes, which may be palpably improvident and hasty. See *Deitrich* v. *Murdock,* 42 Mo. 279; *West Pennsylvania Inst.* v. *Edgewood R. R.,* 79 Pa. 257; *Smedley* v. *Erwin,* 51 Pa. 445; *Giesey* v. *Cincinnati R. R.,* 4 Ohio St. 308.

As then the only real enquiry in this or in any other case where the constitutionality of an act of the Legislature, which authorizes the condemnation of land is simply, whether the use for which the private property is authorized to be condemned is a *public* use or only a *private* use, we will now enquire into the elements, which the courts have held enter into and constitute a *public* use as distinguished from a *private* use of property. This it will be found depends largely upon whether the property condemned is under the direct control and use of the government or public officers of the government, or what is almost the same thing in the direct use and occupation of the public at large, though under the control of private persons or of a corporation; these together constituting one class. Or whether it is in the direct use and occupation of private persons or of a corporation, and the general public has only an indirect and qualified use of the property condemned, or perhaps no use properly of any kind of the property condemned, but simply derives from its use by and for a private person or corporation some indirect advantage, as by the promotion of the general prosperity of the community; these together constituting a second class. To the first of these classes belong cases where the land is authorized to be condemned for public buildings or a public park, and where it is authorized to be condemned for a canal company or a turnpike company.

Where the land is condemned for public buildings or a public park or the like, and public officers have complete control of the property, the act of the Legislature authorizing the condemnation is clearly constitutional, for the use for which the property is condemned is obviously a public use. It is true, that in the case of the *West River Bridge* v. *Dix*, 6 How. Judge Woodbury seemed to doubt, whether property, which was not absolutely necessary, but only convenient for public use could be condemned, and indicated if property could be purchased it should not be condemned for such purposes as hospitals, court houses and jails; but the practice of the States and the federal government since that time in condemning lands for such purposes has been so frequent and so often approved by the courts, that the legislative control over the necessity as well as the particular location of such buildings may be now regarded as universally conceded.

To the same general class belong cases where the general public have the immediate use of the property condemned without charge, as in cases of public highways where the property condemned is under the control of public officers, though the gratuitous use of the property is enjoyed by the public at large, or what differs from it in some important respects, but still belongs to the same general class, where the property condemned is in the hands and direct control of individuals or of a corporation, who hold the title to the property and enjoy it to a large extent as their private property, but who hold it nevertheless in a species of trust for the use of the general public, who are entitled on terms fixed by the law, and not by such private person or corporation to the free use of the property so condemned. Of this character are canals, bridges and turnpikes. No one has ever questioned the right of the Legislature by law to authorize the condemnation of private property for such uses. The uses for which property is condemned when condemned for a canal, a bridge or a turnpike is as obviously a public use as if it were condemned for a court house or other public building, or for a public highway. The fact, that the title to the property condemned belongs to a corporation as private property, in no manner prevents the use of it being directly

for a public use, when the entire public has an equal right to use the property upon the payment of certain tolls fixed not by the corporation, the owner of the canal or of the turnpike, but by the general public through the Legislature.

That in all such cases the Legislature has a right to authorize the condemnation of land, none dispute. See *Chesapeake Canal Co.* v. *Key,* 3 Cranch C. Ct. R. 599; *Mount Washington Road,* 35 N. H. 134; *Arnold* v. *Covington Bridge,* 1 Duv. 372; *Palmer* v. *The State,* Wright (Ohio) 364. The only difficulty in such cases is to determine, whether a road which has been established under a particular act of the Legislature is really a *public* highway or only a private road.

All agree, that if the road has been established by public authority, and the damages for the condemnation of the land has been paid by the general public, and the road is under the control and management of public officers, whose duty it is to keep it in repair, then it is a public highway, and the Legislature may constitutionally authorize the condemnation of land for the route of such a road, though it may have been opened under such act by a county court on the application of a single person to whose house the road led from some public road; and though it may not have been expected when the road was established, that it would be used to any considerable extent by any person, except the party for whose special accommodation it was opened. This was the character of the case of *Lewis* v. *Washington,* 5 Gratt. 265. The court say: "The authority of the county court to establish *public* roads, is a branch of their police jurisdiction, conferred for the benefit of all the citizens of the county, and to be exercised at the common expense out of the resources derived from the county levy.

"The use, convenience and advantage of the public, contemplated by the law, are benefits arising out of the aggregate of such improvements, to which the particular road so established contributes in a greater or less degree. But no limitation upon the power of the court, in regard to any proposed road, is to be found in the degree of accommodation, which it may extend to the public at large. That is a matter which addresses itself not to the authority, but the discretion of the court. It can not be predicated of any particu-

lar road, that it will be of direct utility to all the citizens of the county. It may accommodate in travel and transportation but a small neighborhood, or only a few individuals. Still when established it may be used at pleasure by all the citizens of the county or country; and the public is interested in the accommodation of all the members of the community."

With these views I entirely concur. The Legislature can authorize a county court to open a public highway at the expense of the county, and place it under the control of public officers whose duty it is to keep it in order, and the fact, that the Legislature authorized this to be done on the application of a single person and it was done for his special accommodation, though it might be apparent, that such road would be used to but a very small extent by any other person than such applicant, still such act would be constitutional, and such an opening of a public road by the county court would be in the eyes of the law an opening of the road for public use, and a condemnation of land for such a road would be a legitimate exercise of the power of eminent domain by the State. That which distinguishes such a road from a private road or private way, we will consider more at large after we have gotten clearer ideas of what constitutes a public use.

The second class of cases to which I have alluded is where the property is in the direct use and occupation of a private person or of a private corporation, and the general public have only an indirect and qualified use of the property condemned, or perhaps no use probably of any kind of the property condemned, but simply derives from its use by the owner for his private purposes some indirect advantage, as by the promotion of the general prosperity of the community. To this class belongs railroads, ferries, and grist-mills, as well as some other species of property and employments, to which we will presently refer. It is obvious, that this entire class differ greatly from the first class, of which we have spoken, and that unless carefully guarded there is great danger, that the Legislature urged on by a popular sentiment or claim would authorize private persons or private corporations, claiming to come under this second class, to condemn lands nominally for the public use, but really for their own private

use in violation of the rights of private property, as designed to be protected by the Constitution. The courts have therefore in such cases thrown around the owners of private property safeguards, which we should be careful not to permit to be broken down.

I think we can show from the decisions, that a person or corporation claiming to belong to this second class, and to have legislative authority to condemn lands, must first show, that he or they are possessed of each and all of these three qualifications. First, the general public must have a definite and fixed use of the property to be condemned, a use independent of the will of the private person or private corporation in whom the title of the property when condemned will be vested; a public use which cannot be defeated by such private owner, but which public use continues to be guarded and controled by the general public through laws passed by the Legislature; second, this *public use* must be clearly a needful one for the public, one which cannot be given up without obvious general loss and inconvenience; third, it must be impossible, or very difficult at least, to secure the same public uses and purposes in any other way than by authorizing the condemnation of private property.

If any one of these essentials are wanting, the courts will declare the act of the Legislature authorizing such condemnation of private property to be unconstitutional, because it would amount to taking private property for *private* and not for public uses. It is obvious, that both railroad companies and owners of ferries have all these three qualifications; and accordingly no one disputes the right of the Legislature to authorize either railroad companies or owners of ferries to condemn lands for their appropriate uses.

First, the general public has a definite and fixed use of both a railroad and a ferry, a use entirely independent of the will of the railroad company or ferry owner; a public use, which cannot be defeated by the railroad company or by the owner of the ferry, but which continues always to be guarded and controlled by law. The general public have a right to use the railroad or ferry for the transportation of persons or property, at fixed rates prescribed by the law, and neither the railroad company nor the owner of the ferry has

a right to decline to permit any one of the general public to
so use the railroad or ferry for transportation; nor can they
charge beyond what the law permits them to charge for such
use of their property.   They then do not own ·this property
as their private property in the sense in which all others own
private property; but this property in their hands has
placed upon it a trust for the general public use, which trust
they cannot violate or disregard.´  Second, it is obvious, that
this public use of both railroads and ferries is clearly a need-
ful one for the general public, and one which could not be
surrendered by the public without obvious loss and general
inconvenience.  And lastly it is obviously impossible for
either railroads or ferries to be established and run for the
public use, unless the railroad company or the owner of the
ferry is allowed to condemn lands for these purposes.

One man by his obstinacy or excessive avarice might
readily prevent the building of a railroad.  For in many
instances it would be physically impossible to run around or
avoid passing through his farm, and but for the power of
condemning his land he could prevent the public from hav-
ing the use of a railroad, which might be almost indispensa-
ble to the progress and development of the country.

So too by refusing to permit a landing, one obstinate man
could prevent the establishment of a ferry necessary for the
public use, as the ferry could often be only established by
there being a landing on his property.  As these three re-
quisites unite in the case of railroads and ferries, all agree,
that lands may be condemned for their use.   See *Buffalo R.
R.* v. *Brainard*, 9 N. Y. 100; *Beekman* v. *Saratoga R. R.*, 3
Paige 45; *Raleigh R. R.* v. *Davis*, 2 Dev. & B. 451; *Swan* v.
*Williams*, 2 Mich. 427; *Pine Grove* v. *Talcot*, 19 Wal. 666;
*Secombe* v. *Milwaukee R. R.*, 23 Wal. 108; *Weir* v. *St. Paul
R. R.* .18 Minn. 155; *Concord R. R.* v. *Greely*, 17 N. H. 47;
*Brown* v. *Beaty*, 34 Miss. 227; *Swann* v. *Williams*, 2 Mich.
427; *Stewart* v. *Polk County*, 30 Iowa 9; *Day* v. *Stetson*, 8
Me. 365.  Upon the principles we have laid down it would
follow, that the Legislature could not authorize lands to be
condemned for the erection of dams, or for the overflowing
of lands by dams erected for saw-mills or manufactories gen-
erally, because they obviously want the first qualification we

have laid down as necessary to confer this power on the Legislature. The general public have no definite and fixed use of any such mills and manufactories; they have no use of them, which is independent of the will of the owners of such mills and manufactories, and they can be defeated in any sort of use of such mills and manufactories at the pleasure of the owners of them. For the Legislatures have never required saw-mills or manufactories generally to do work for any one, except those for whom they chose to work, nor have they fixed their prices for work, nor do they require them to continue their business as manufacturers any longer than they choose to do so.

It would seem therefore to follow, that the public had no such use in such mills or factories as would justify the Legislature in authorizing them to condemn lands, and this has been the decisions of the courts in Maine, New York and Michigan. See *Jordan* v. *Woodward*, 40 Me. 317; *Hay* v. *Cohees*, 3 Barb. 42; *Ryerson* v. *Brown*, 35 Mich. 333. The same doctrines are held in Vermont where they hold, that the Legislature can not even authorize the condemnation of lands for a grist-mill. See *Tyler* v. *Beacher*, 44 Vt. 648. And that there could be no condemnation of lands for any sort of mill except for a water grist-mill is fairly inferable from *Sadler* v. *Langham* and *Moore & Wright* v. *Rice*, 34 Ala. 325. In *Loughbridge* v. *Harris*, 42 Ga. 505, the court holds, that there can be no condemnations of lands for any sort of factories or mills including water grist-mills.

But on the contrary statues have been sustained as constitutional, which authorized the condemnation of lands for water powers to establish mills and factories in Massachusetts, New Jersey, Connecticut, Tennessee, Minesota and Kansas. See *Boston Mill Dam* v. *Newman*, 12 Pick. 467; *Scudder* v. *Trenton Falls Co.*, 1 N. J. Eq. 694; *Olmstead* v. *Camp*, 33 Conn. 532; *Harding* v. *Goodlett*, 3 Yerg. 41; *Miller* v. *Troost*, 14 Minn. 365; *Harding* v. *Funk*, 8 Kans. 315. And the Supreme Court of the United States in *Holyoke Co.* v. *Lyman*, 15 Wal. 500, recognize this doctrine to a certain extent.

These decisions are based on the idea, that public use does not mean, that the public should have either the immediate

use of the property condemned, or the control by law of those for whose use the property is condemned, but that public use means simply public utility or usefulness in its most general sense; that is public convenience or benefit resulting in any incidental manner. But this ground of these decisions puts the exercise of the right of eminent domain on such a loose and unsatisfactory basis, that it has been disapproved of in some of the very States in which it had been long acted upon. And while they still hold such acts of the Legislature constitutional, the courts admit, that they have gone to the very verge of constitutional power, and say, that but for the long continued decisions of their courts they would hold such acts to be unconstitutional, while others given them for reasons of this character a reluctant support. See *Ocum Co.* v. *Sprague Co.*, 35 Conn. 496; *Powers* v. *Bears*, 12 Wis. 213; *Miller* v. *Troost*, 14 Minn. 365. In some States, as in Michigan, they have reversed their previous decisions. See *Ryerson* v. *Brown*, 35 Mich. 333.

The truth seems to be, that in the early history of this country when water power was the exclusive means whereby mills could be driven, the Legislature encouraged the development of this water power as a matter of great public utility, and from an urgent necessity then supposed to exist, delegated this power of eminent domain to persons desiring to erect mills, and in so doing frequently exceeded their constitutional powers. But these acts were sustained by the courts at first without much consideration of the subject, no contest over the matter having been raised for many years; and when the question was afterwards raised, the constitutionality of these mill acts was sustained partly because of long acquiescence, and partly because of a supposed urgent public convenience and necessity. But in modern times, when these questions have been considered under more favorable circumstances, the decisions have been generally against the constitutionality of these mill acts.

Perhaps on principle the water grist-mills of this State and of Virginia ought to be made exceptions, as we have seen that the owners of such mills by the laws are required to grind for all alike and at fixed tolls, which brings them clearly within the same category as railroads and ferries,

the only difficulty intervening being, that at this time it can not perhaps be said, that unless the owners of water grist-mills are allowed to condemn lands it is impossible or even very difficult for the people of this State to have their grain ground. This was no doubt formerly perfectly true, and the courts then could not have done otherwise than hold, as they did, that the owners of water grist-mills might condemn lands. And this has been so long the established custom of the State, that no doubt it would not and ought not to be now departed from, unless the Legislature thinks proper to change the statute laws on the subject. Owners of hotels would have the same grounds for claiming, that if authorized by the Legislature they could condemn lands. But such legislation would not be constitutional, as it is obvious, that it is neither impossible nor very difficult to have hotels built, as they always have been, without the exercise of the power of eminent domain in their behalf.

It would seem therefore from these principles to be clear, that the Legislature cannot authorize the condemnation of lands in any case, no matter how urgent, for the establishment of a private road. In *Taylor* v. *Porter*, 4 Hill 140; *Rice* v. *Alley*, 1 Snead 51; *Clack* v. *White*, 2 Swann 540 and *Osborne* v. *Hart*, 24 Wis. 90, it was decided that statutory laws very similar to those contained in chapter 194 of the Acts of 1872–73, so far as the provisions in said chapter relates to private roads, were unconstitutional, because they authorized lands to be taken and condemned for the purpose of making private roads for the use of an individual, and that too though he paid all the costs of opening the roads and maintaining the same. But it should be observed, that there were in the statute laws of New York, Tennessee and Wisconsin where these decisions were rendered a provision not to be found in said act of chapter 194 of Acts of 1872–73. This provision was: "Every such private road when so laid out shall be for the use of the applicant, his heirs and assigns, but not to be converted into any other use or purpose than that of a road. Nor shall the occupant or owner of the land be permitted to use the same, unless he shall have signified his intention of so making use of the same to the jury or commissioners, who ascertained

the damages sustained by laying out such road before such damages were so ascertained." This provision evidently had some influence with the courts in reaching the conclusion they did. I do not however think, that this provision had a controlling influence on these courts. And from this reasoning I infer, that they would have reached the same conclusion though this provision had not been in their statute law. But the same conclusion was reached in *Wild* v. *Deig*, 43 Ind. 455; *Stewart* v. *Hartman*, 46 Ind. 331; *Burkhead* v. *Brown*, 25 Iowa 540; *Sadler* v. *Langham*, 34 Ala. 311; *Nesbitt* v. *Trumbo*, 39 Ill. 110; *Crear* v. *Crossley*, 40 Ill. 175; *Dicky* v. *Tennison*, 27 Mo. 373.

There were no provisions in the statute law of any of these States resembling that in the New York statute, but these laws were very similar to those provisions of our law contained in chapter 194 of the Acts of 1872–73 in reference to private roads. The ground of their decisions are thus expressed by Chief Justice Dillon in *Buckhard* v. *Brown*, 25 Iowa 545. After quoting the constitutional provision, that "private property shall not be taken for public use without just compensation," he proceeds then: "The following propositions applicable to this case may be regarded as plain in themselves, and as having the sanction of authority :

"1. The constitutional limitations above quoted prohibits by implication the taking of private property, for any private use whatever, without the consent of the owner. In the matter of *Albany Street*, 11 Wend. 151; *Embury* v. *Conner*, 3 Const. 511; *Taylor* v. *Porter*, 4 Hill (N. Y.) 140; *Beekman* v. *R. R. Co.*, 3 Paige 73; Mr. Sedgwick's opinion in Constitutional Law p. 514; *Concord R. R. Co.* v. *Greely*, 17 N. H. 47; *Dunn* v. *Charleston*, Harper (S. C.) Con. R. 189.

"2. It forbids private property from being compulsorily taken for any but *public use*, and then only upon just compensation being made, the amount of which is to be assessed by a jury. Bill of Rights § 18 and authorities just cited.

"3. When the public exigencies demand the exercise of the power of taking private property for the public use, is solely a question for the Legislature, upon whose determination the courts cannot sit in judgment. *Spring* v. *Rupell*, 7 Greenl. 292; *Concord R. R. Co.* v. *Greely*, 17 N. H. 47; *Varick* v.

71

*Smith*, 5 Paige 160; *Hartwell* v. *Armstrong*, 19 Barb. 166; *Bloodgood* v. *Railroad Co.*, 18 Wend. 14; *Beekman* v. *Railroad Co.*, 3 Paige 72; Sedgw. on Const. Law pp. 511–514.

"4. That what is such a public use as will justify the exercise of the power of eminent domain, is a question for the courts. 2 Kent Com. 340; *Concord Railroad Co.* v. *Greely*, 17 N. H. 47; *Hausen* v. *Vernon*, 26 Iowa. But if a public use, be declared by the Legislature the courts will hold the use public, unless it manifestly appears by the provisions of the act, that they can have no tendency to advance and promote such public use. Per Shaw C. J. in *Hazen* v. *Essex County*, 12 Cush. 477. That private property may be constitutionally taken for public highways can not be doubted and is not denied. * * * The State may properly provide for the establishment of a public road or highway to enable every citizen to discharge his duties. The State is not bound to allow its citizens to be walled in, insulated, imprisoned; but may provide them a way of deliverance. The State may provide a public highway to a man's house, or a public highway to coal or other mines.

"If the road now in question had been established as a public road under the general road law, as we confess we do not see why it might not have been, there would be in our minds no doubt of its validity, although it does not exceed a half a mile in length, and traverses the lands of but a single owner. For the right to take land for a public road, that is a road demanded by public convenience, as an outlet to a neighborhood, or it may be as I think for a single farmer, without other means of communication, cannot depend upon the length of the road, or the number of persons through whose property it may pass.

"With respect to the act of 1866, and we could say with respect to the provisions of our chapter 194 of Acts of 1872–73 in reference to private roads, which are essentially the same as this Iowa act of 1866, we are of opinion, that the roads thereunder established are *essentially private*, that is on the private property of the applicant therefor because:

"*First.* The statute denominates them *private roads.* If these roads are not *private* and different from ordinary and *public roads*, there was no necessity for these provisions.

*Second.* Such road may be established upon the petition of the applicant alone; and he must pay the costs and damages occasioned thereby, and perform such other conditions as to fences, &c., as the board may require.

" *Third.* The public are not bound to work or keep such roads in repair, and this is a very satisfactory test as to whether a road is public or private.

"*Fourth.* We see no reason when such a road is established, why the person at whose instance it was done, might not lock the gates opening into it or fence it up, or otherwise debar the public of any right thereto.

"Could not the plaintiffs in this case having procured the road in question abandon it at their pleasure? Could they not relinquish it to the defendants without consulting the board of supervisors? If this is so does it not incontestably establish the fact, that it is essentially *private?* For it must be private if it is of such a nature, that the plaintiffs can at their pleasure use or forbid its use, abandon or refuse to abandon it, relinquish or refuse to relinquish it? If the act of 1866 is valid might not the plaintiffs, having procured the road, use it for laying down a tram or horse railway, and forbid everybody from using the road, and even exclude all persons therefrom? Who could prevent it? These considerations make the great difference between such a road and a public highway, and demonstrate the essentially *private* character of the road."

The judge then proceeds to show, that these views are sustained by the weight of authority, and in reversing the cases well says that: " *Harvey* v. *Thomas*, (10 Watts 63) followed in the case of the *Pocopsen Road* (16 Pa. St. 15), are of doubtful soundnesss outside of Pennsylvania." He concludes, that " wherever by any well considered decision private roads have been sustained, it was because they were regarded as public in their character; and if so properly regarded laws authorizing their establishment would doubtless be valid * * We have the less hesitation in declaring the act of 1861 unconstitutional, inasmuch as every useful purpose it was intended to accomplish may be attained under the general statutes of the State authorizing the establishment of public roads."

I have quoted this opinion of Judge Dillon at some length, because it expresses accurately my views of the provisions of chapter 194 of Acts of 1872–73, so far as they refer to private roads. They are indeed very similar to this act of Iowa of 1866. Judge Beck dissented from this opinion on the ground, that though this road was called in the act a private road yet it was when opened essentially a public road, which the public possessed the same right to use as a road established in any other manner authorized by law. In my judgment the views of Chief Justice Dillon are well sustained by the weight of authorities, many of which we have before cited.

The best considered cases in opposition to these views were decided in part on a diversity in the statute laws, but principally because of a fundamental difference in opinion as to what is properly meant by "public use," for which alone lands can be condemned. In some of the States these words are considered simply as "public advantage or general welfare." And in those States lands may be condemned to establish dams for the erection of mills of any character, though such mills when erected are purely private property, and are in no manner controlled by the public; and thus owners work for whom they please and at what prices they please, or if they choose decline to do any work of any sort. Such is the law in Massachusetts as interpreted by their courts, and with such views it is natural that they should hold that private roads may be established under a law authorizing private property to be condemned for their route. See *Sherman* v. *County Commissioner*, 112 Mass. 202. Like views are expressed in *Proctor* v. *Andover*, 42 N. H. 348; *Coster* v. *Tidewater Co.*, 18 N. J. Eq. 54; *Sherman* v. *Burch*, 32 Cal. 241; and in some other cases. But we need not review them, they all proceed on the basis, that such private road are essentially for the public use, and their idea of what constitutes public use is essentially different from ours.

The views which I have expressed are in accord with the views on this subject, which have been expressed by the Court of Appeals of both Virginia and West Virginia. Thus in *Lewis* v. *Washington*, 5 Gratt. 265, it was decided, that under the statute law of Virginia, which is the same as ours, there was no limitation to the power of a county court

to establish a *public* road was to be found in the degree of accommodation, which it may afford the *public* at large. That is a matter, which addresses itself not to the authority but to the discretion of the court; and that it the road so established led into a public road its other terminus might be a private farm or dwelling-house. No individual has the right to demand the opening of such a public road for his accommodation. The court say: "It redounds in some degree, to the interest of the public, that all the citizens who compose it should be so accommodated; and there is no principle, upon which the wants and necessities of one individual must be imperatively rejected, which would not be applicable to two or three or a dozen, or any given number short of the whole or the greater part of the community." And again: "It appears," says the court, "that the road is requisite to enable the applicant to travel to the court house of his county, and other public places contemplated by law."

The road in that case was a *public* road to all intents and purposes, and was established under the same law and in the same manner with all other public roads. That it is proper to open such a road to the residence of a citizen seems to me clear, as the public have a direct interest in enabling all the members of the community to perform their public duties, which they might not be able to perform if they could not reach the court house without trespassing on their neighbor, or if the sheriff or other officer could not go their houses without committing such trespass.

In the *Salt Company* v. *Brown*, 7 W. Va. 191 this Court decided as stated in the syllabus, "that an incorporated company being the owner of coal lands desires to obtain a subterranean passage through or under the lands of another person for the purpose of mining and removing its own coal, and applies to the court for the benefit of sections 44 and 45 of chapter 43 of the Code. The report of the commissioners and the evidence in the case show, that the company is the owner of some thirty acres of coal land, from which coal could not be mined and transported without going through the land of the defendants; that the company use said coal for the purpose of manufacturing salt at their furnaces, and to sell to the public living in and about Hartford city; that

the people living in and about said town could obtain coal also from other sources, and that the *public would not use the subterranean way, set out and described in the commissioner's report, through the land of the company, but the company only: Held,* That the report and evidence do not show, that the purpose for which the property is taken is such public utility as that the said report should be confirmed by the court under section 45 of said chapter 43 of the Code."

Judge Paull says in this case p. 199 referring to the examples given by Judge Cooley in his work on Con. Limit. 532: "In looking at the class of objects above enumerated we find, that they are all of an undoubted needful character; in other words there is connected with them all a clear *public* use; this element is indispensable; again we find in regard to them all, *the government still maintains its power, and can so regulate and control the action of the agencies, by which they are managed as to secure the rights and interest of the public therein*; and if to these we add the impossibility or extreme difficulty at least of effectuating the same purpose in any other way, we may perhaps find in the combination of these three elements a safe rule for our guidance in any particular case, whether there has been a constitutional exercise of the right of eminent domain." It will be observed, that these are just the views, which I have expressed and enlarged upon in this opinion.

It is obvious under this rule, that the acts of Massachusetts and other States known as mill-acts, whereby water-power is condemned for private mills, which are under no public control after they are built, would necessarily be declared unconstitutional. And it is principally due to what I conceive to be false views of what is meant by public use, that some of the States have held the condemnation of lands for private roads to be constitutional.

Chapter 194, section 44, of Acts 1872–73, which we are considering provides: "The court shall grant such private road if it be made to appear, that the same is necessary to enable the applicant to reach and enjoy his own property, and that the granting thereof will not entail irreparable injury upon the party through whose lands the same will run." Now on the principle which we have laid down it seems to

me obvious, that "the reaching and enjoying one's own property" cannot possibly be regarded as a public use. It does not necessarily amount to a public benefit when this word is used in its most general and loose sense. It is obvious that the purpose of this road as thus declared in the act is a mere private use in which the public has no rights of any sort. And for such a purpose the condemnation of land cannot be authorized by the Legislature, without a disregard of our Constitution. If the purpose had been to give access to one's residence, then it might be argued perhaps that as the person was a citizen owing public duties, which he could not perform unless he had a road from his residence, the public had an interest in his being given the means of performing these public duties; and that his use of such a road in the performance of such duties ought not to be regarded as a private use of the road, but as a use of it by such citizen as one of the public, and in the performance of a public duty. Even then however it would seem but right if not absolutely necessary to make such a road a public road, and that it should be under the control and management of a public officer, and should be kept in order by the public; and if it was closed like the closing of any other public highway it should subject the offender to punishment. It is difficult to conceive how any road can be regarded as a public highway, which is not subject to the supervision and control by the public.

But this road under this act is not subject to this supervision and control and was opened to give access not to the residence of the applicant, but simply to his lands, not that he might have the means of performing his public duties, but for the far different purpose of enabling him individually to enjoy his property; in other words to enhance the value of his private property. This is surely no public use.

Our conclusion therefore is, that the 44th section of chapter 194 of the Acts of 1872-73 is unconstitutional, null and void; and that therefore the judgment of the circuit court of Harrison county rendered on June 6, 1881, whereby the *supersedeas* granted to A. J. Varner from the order of the county court of Harrison, made August 19, 1880, was dismissed, and A. J. Varner ordered to pay to Lehi Martin his costs by him expended, must be reversed, set aside and

annulled, and the plaintiff in error, A. J. Varner, must recover of the defendant in error, Lehi Martin, his costs in this Court expended. And this Court proceeding to render such judgment as the circuit court of Harrison, should have rendered doth moreover, set aside and annul the orders of the county court of Harrison, whereby the private road named in the report of the viewers in this case was established on certain conditions, and doth adjudge, that the said Lehi Martin do pay to A. J. Varner his costs expended in the circuit court of Harrison; and proceeding to render such judgment as the county court of Harrison should have rendered it is ordered, that the petition and application of Lehi Martin for said private road be dismissed, and that he pay to A. J. Varner his costs expended in the county court of Harrison.

JUDGES JOHNSON AND SNYDER CONCURRED.

JUDGMENT REVERSED. PETITION DISMISSED.