# CHARLESTON.

## LAZZELL *v.* GARLOW.

Submitted September 7, 1897—Decided March 26, 1898.

1. INJUNCTION—*Trespass—Title.*
   To warrant the interference of a court of equity to restrain a trespass, two conditions must co-exist: First, the plaintiff's title must be undisputed, or established by legal adjudication; and, second, the injury complained of must be irreparable in its nature. (p. 480).

2. INJUNCTION—*Trespass.*
   As a general rule, an injunction should not be granted to re-

strain a mere trespass to real property, when the injury complained of is not destructive of the substance of the inheritance,—of that which gives it chief value,—or is not irreparable, but is susceptible of complete pecuniary compensation, and for which the party may obtain adequate satisfaction in the law courts; and in no such case should it be granted in the absence of an allegation of the insolvency of the defendant. (p. 483).

3. HIGHWAYS—*Discontinuing Highway.*

No public road once established 'by any of the ·modes prescribed or provided by law can be discontinued by proceedings of the authorities of a county without the three-weeks public notice required by section 30, chapter 43, Code. (p. 481).

Appeal from Circuit Court, Monongalia County.

Suit by Luther J. Lazzell against J. Marion Garlow for an injunction. From a decree perpetuating an injunction granted, defendant appeals.

*Reversed.*

OKEY JOHNSON and L. V. KECK, for appellant.

COX & BAKER, and I. G. LAZZELL for appellee.

MCWHORTER, JUDGE:

Luther J. Lazzell filed his bill in the circuit court of Monongalia county, at October rules, 1892, against J. Marion Garlow, alleging the possession of one hundred and forty-three acres of land, conveyed to him by three different deeds, and filing such deeds as exhibits with such bills, claiming that he had an indisputable title to said one hundred and forty-three acres of land, and that, being so possessed in fee, the defendant committed trespasses thereon, by tearing down and destroying his fencing, and with horses and heavy timber wagons, driving over his land, and hauling heavy timbers through and over it, greatly to his damage, and notwithstanding he gave defendant written notice not to so trespass, he continued such trespassing, tearing down his fencing as often as plaintiff built it up; that he brought several actions of trespass to recover damages, but defendant did not cease to trespass, damage, and harass the plaintiff, and to break down, tear to pieces, and destroy his fences and to haul through his land; that he threw plaintiff's land open to the commons, and stock run-

ning at large were almost constantly and daily entering his land, and depasturing and damaging the same, besides putting plaintiff to the trouble and expense of turning them out, and preserving, as far as he could, his pasture from destruction, his land from being trampled, his sod upturned, and other damages being done to his said land, and that by reason of such trespasses he was unable to have the use of his land for pasture and otherwise, and that irreparable damage would be, and was being, done him by the trespasses of the defendant; that the damages could not be measured by any accurate standard, on ac-account of the nature of the trespass and the character of the damages, and that his remedy at law was not adequate, —and praying for an injunction inhibiting and restraining said defendant, his agents and employes, and all other persons, by virtue of any authority, permission, and agreement of and with the said defendant, from permitting such trespasses, or passing through any of the land of the plaintiff in the bill mentioned, either at the place where the defendant had been injuring and tearing down fences, hauling and driving over said land, or at any other place within the inclosure of the plaintiff, or within the limits of the boundary of plaintiff's land aforesaid, until such time as the defendant should answer in the premises, and show cause why he should not be restrained. An injunction was granted thereon, according to the prayer of the bill, by the judge of said court, on the 14th of September, 1892. At the same rules the defendant filed his demurrer to the bill, averring that the same was not sufficient in law, and, taking said averments of the bill as true, that plaintiff has adequate and full remedy therefor at law; and, without waiving said demurrer, defendant proceeded to answer said bill, wholly denying all material allegations thereof, denying that he had trespassed upon plaintiff's land, or destroyed his fences upon his land, but claiming:

That plaintiff knew at that time, and has known all his life, that the place where respondent, or those engaged in hauling out timber from respondent's land, adjoining the lands of the plaintiff, referred to in the bill, passed over the lands of the plaintiff, or laid down or opened his fence, was on, over, and along a public big road,

located and established there so long ago that the memory
of the good people of that community knoweth not to the
contrary, and that said road had been worked and kept up
by the public in like manner as other public roads of the
county, and by the private labor of respondent and others
using the same, without objection by the plaintiff or any
one else, until about the time of the committing of the al-
leged acts of trespass by respondent, when plaintiff, to an-
noy, hinder, and prevent respondent and his vendees from
getting a large lot of heavy timber, respondent had sold,
to market, said plaintiff, or his confederates, with his
knowledge and concurrence, built a fence on and across
said road, as in said answer more fully shown; and that
this was the fence, and the only fence, of plaintiff, that
respondent laid down as the teams hauling came to it, and
this road was the only place along or over which said
teams or respondent passed or attempted to pass with
said teams or carts, as the plaintiff well knew, notwith-
standing the false and malicious allegations and insinua-
tions of his iniquitous bill; and respondent was informed
and believed that the neighborhood where these lands lie
was, if not the oldest, among the oldest, improved lands in
the country, antedating the Declaration of Independence,
and at a very early date (perhaps as early as 1790) a public
road was duly established and opened from the Pennsyl-
vania line, at a certain point, marked "O" on a diagram
filed with his answer, running thence southward to the
southwest corner of what is now plaintiff's land, and
thence on in the direction of Maidsville and Morgantown,
which road for many long years constituted the only pub-
lic road through and from that settlement to Morgantown,
their county seat. That said route and road was fenced
on both sides nearly the entire length for many years by
the respective landowners, and up to the 18th day of Au-
gust, 1892, when plaintiff built a worm fence, two or three
panels long, over and across said road, for the purpose of
preventing respondent from getting out from his lands
a large lot, to wit, one hundred and fifty sticks or trees, of
heavy timber that he had sold to one John Sidwell; and
files a plat of said road and abutting lands, which is made
part of the record. That respondent's lands laid down on

said plat are the tracts called "Bodley Land," containing forty-one acres, and the other north of it, containing one hundred and sixty-five acres; the same lands conveyed to respondent by his father, John Garlow, by deed bearing date the 1st of April, 1875, a copy of which is filed with the answer, which lands respondent says are very valuable, with a road to get to and from them. That the lands south of respondent's forty-one acres are complainant's, southward as far at least as L, a point marked on the plat, and he also owns a lot of land called the "Simpkins Land." That, a good many years ago, Thomas Lazzell, Sr., the grandfather of the plaintiff, had a public road established and opened between points named on the plat. That soon after the opening of this last named road, to wit, about the ————day of————, 1856, a petition was filed by William Conaway and others before the county court of said county, asking for a view or a review of a route for a road commencing at the mouth of Craft's run, a branch of Robinson's run, at L, on said plat, and thence by James Lazzell's land to the Pickenpaugh farm, at or near the Pennsylvania line, and viewers for the same were appointed; and on the 22d day of September, 1856, the county court made an order establishing said road. And respondent filed, as an exhibit with his answer, a copy of the order of the county court. which says that "on Monday, the 22d day of September, 1856, Mathias W. Davis, commissioner of roads for the W. D. of this county, this day reported to court a survey of alterations in the road from the mouth of Craft's run, through lands of James Lazzell, the heirs of George W. Simpkins, the heirs of Ephraim Garlow, George Keener, and Amos S. Courtney, to the Pennsylvania line; and, it appearing that the proprietors do not dissent, it is ordered that the said road be opened and established as a public highway, and that the petitioner's costs be paid to the proper officers out of the county levy." That not long after the establishment of the said road, which gave an outlet to the landowners in the direction of the court house, the owners of the said lands now owned by respondent, and Simpkins, the owner of said ten acre parcel, who had no other outlet in the direction of Maidsville and the court house than said old road, to wit, on the

25th September, 1868, William E. Garlow and others filed their petition before the then board of supervisors of said county, asking said board to disannul a part of said old road first named, leading from Asa Davis' to the state line, beginning at the west or northwest corner of James Lazzell's land, known as the "Simpkins Land," and ending near the old Pickenpaugh house, then owned by J. E. Taylor; reciting that the above-mentioned part of the old road had not been worked or kept in order by any person since the new road had been worked and opened, and averring that the part of said old road asked to be annulled was from letter B, in red, on said plat, and with the red line to A, at the corner of the Pickenpaugh land, and that the new road referred to in said petition is none other than the road beginning at L, and running with the established line to C, where it intersects the Lazzell road aforesaid. And filed with his answer copies of said petition praying for the disannulling of a part of said old road, and the report of the commissioners appointed to view said road, which report by the viewers says that "after being duly sworn, passed over and viewed road set forth in the petition of John Garlow, asking the board to disannul the road leading from the northwest corner of James Lazzell's land, known as the 'Simpkins Land,' to the forks of the road near the Pickenpaugh house. In our opinion, said road ought to be disannulled as a public road." And he also files as an exhibit with his answer a certified copy of the order of said court made on the 2d day of March, 1869, accepting and approving the report of the commissioners, and ordering that the road referred to be disannulled, in accordance with the law and report of the viewers, and averring that in the proceedings just mentioned the said old road was expressly recognized as a public road from its beginning to its end, in 1869, and the south end of said road, from letter B to L, was left untouched, and remains a public road, and fenced and used as such ever since to the present time, and that although it is true that said old road was regularly established, as respondent was informed and believed, and fully opened and worked by the public as a public road, owing to the antiquity of said order, and the burning of the court house and judicial re-

cords, likely, since said road was established, respondent
could not find said order, although he had made diligent
search for it, but that he could prove that said road was
worked by the public as a public road, that he himself had
worked it when the public neglected to do so; and claimed
his lawful right to travel and use said road as a public
road, and denied the right of the plaintiff or any one else to
obstruct or close it up against him, and claimed that, in-
stead of himself being held out as a wilful trespasser on
said land, the plaintiff was liable to be punished for wilful-
ly obstructing and closing up said road. And, as further
showing that said road was a public road, respondent filed
a copy of a survey made June 8, 1835, by John Hanway,
then county surveyor of said county, who was well ac-
quainted with perhaps every road in the county, who sur-
veyed for James Bodley, then the owner of the thirty-five
and one half acres of land, a part of the forty-one acres
laid down on the plat, now belonging to defendant, which
survey calls for the said old road; and by deed of July 5,
1836, from Thomas Lazzell to said Bodley, it is expressly
recognized as beginning at the hickory at the side of the
same big road, and thence along said road for several lines
and courses, as appears from said deed, filed as an exhibit
with his answer. Respondent further averred that said
old road was intended and understood to be located on the
division lines between the said landowners on both sides of
said road, from one end to the other, as nearly as the con-
tour or surface of the ground would permit, yet, owing to
said surface, said road would in some places be a little
more on one side of said divisional line or lines than the
other, and the fences along said road were built and kept
up, accordingly, as a rule, except for a short distance, of
perhaps one hundred feet, on each side of the tranverse
blue line at H on said plat, by reason of an abrupt angle in
the line at that point between Peter Conaway and James
Lazzell; and said road cut off a small wedge, containing a
fraction of an acre, of said James Lazzell's land, and, being
too small and ill-shaped to fence by itself, said James Laz-
zell, before he conveyed said land to plaintiff (about twelve
or thirteen years ago), without consulting any one, so far as
respondent knows, changed said roadbed, and, when re-

monstrated with for so doing by respondent, said he did not thereby mean to close or obstruct said road. but there was still room there for a convenient road outside of his fence on his land, which should be used as a road there, instead of the old roadbed at that point; and, respondent seeing that the new was about as good as the old one, the new one has ever since been used as a road, without objection or complaint, until the 18th day of August, 1892, when the plaintiff, of his own will, and to annoy, harass, and injure respondent, built a fence across said road, and forbade respondent or his teams from going in or through that fence, or on or along said road, so far as it was on or bordered on his land. And averred that plaintiff is now estopped from denying that said changed location so made by him, and used and acquiesced in by respondent and the public, is a part of said public road, or else said plaintiff should be compelled to restore and replace said road back on said old location.

Depositions of various witnesses were taken by both parties, and filed in the cause, from which, as well as from the documentary evidence, it is clear that an old public road running from the Pennsylvania state line, by way of the Pickenpaugh place, and thence, through and along by the lands of various parties, including appellant, appellee, Simpkins, Conaway, and others, to Craft's run, and on to Morgantown, had been in use from time immemorial, and worked and kept up as a public road; that some of the deeds exhibited by the plaintiff himself with his bill recognized the same as a public road. While appellee raises some question about the formal or legal establishment of this road, as no record of it can be found, which is probably sufficiently explained by the fact that the court house and records of the county were once destroyed by fire, yet it is hardly seriously contended that it was not once a public road, having been worked by the authorities and treated as such for sixty years and more, within the memory of some of the witnesses examined in the cause. It seems that the distance from the state line to the old Pickenpaugh house is about one-quarter of a mile, and from said house to Craft's run, beyond which there is no dispute, is about a mile, or a little over. In addition to the

action of the old county court set out in defendant's answer, further proceedings were had later, apparently for the establishment of the same road that seemed then to be established in 1856, as disclosed by records filed with the various depositions taken in the cause. At May term, 1862, the county court of Monongalia, acting upon a petition filed for that purpose, ordered the road commissioner for the Western district of the county to view and mark out a route for a road commencing at Limekiln hollow, at the end of James Lazzell's lane, to intersect the road leading from Robinson's run to Taylortown, at or near the late residence of Thomas P. Wade, deceased, and report according to law. H. Barb, the commissioner, executed the order and reported: "The ground is good for a road, and the grade is also good; running through the land of James Lazzell, Bowers Davis, Nancy Conaway, Thomas F. Lazzell; and on the line between Thomas F. Lazzell and Emory J. Wade, till the last few rods, is all on Wade, and on the line between Thomas Lazzell, Sr., and said Wade," —and states that Nancy Conaway and Bowers Davis claim damages. It was shown that the order book was mutilated, and the orders from June term to October term, 1862, are gone; but a file memorandum in the office, certified by the clerk, shows that the road was established at October term, 1862. Again, in September, 1864, a petition was presented to the supervisors of Monongalia county "for a review on the road commencing at mouth of Craft's run, and thence by James Lazzell's to the Pickenpaugh farm, at the Pa. line," whereupon the supervisors appointed three reviewers on the 21st of September, 1864. Said reviewers reported, March 8, 1865, that they had commenced at the mouth of Craft's run, and viewed a route, and reported the new route to be the most practicable to individuals, as well as the public at large; that they left the old road at Limekiln hollow, thence through the lands of Bowers Davis, Nancy Conaway, Thomas Lazzell, Jr., Thomas Lazzell, Sr., and Emory Wade, and with the line of John Taylor's and Ephriam Garlow's heirs, to intersect the road from Robinson's run to the state line, which was some two or three hundred yards southwest of the Pickenpaugh house. If the establishment of the new location

was intended to be in lieu, and to take the place, of the old road from Craft's run north, and to supersede it entirely, and to discontinue the old road, the effect would have been to deprive the appellant, with his large and valuable farm, and Simpkins, who then owned a small farm on the old road, and perhaps others, of all advantages of a public road, or, indeed, of any way of ingress and egress whatever, and to leave them wholly at the mercy of the owners of the land which completely surrounded them. That this was not intended, and not even thought of, at the time, nor for many years afterwards, is very clear from the record. The new road established was located, in the widest place, eighty rods from the old, and an average of some thirty-five or forty rods from it; serving and accommodating other people than the old road served, so far as the abutting landowners were concerned.

Levi Fortney testified that he was seventy-eight years old; had been acquainted with that road for sixty years or upwards; that he had worked on that road, and had traveled it, more than sixty years; that about 1872 to 1876 he lived on the Bodley land, now owned by defendant; that while he lived there the road running from said Bodley land, between the lands owned by Conaway and Simpkins, on the one side, and James Lazzell, on the other, was the only outlet to Maidsville or Morgantown that he (Simpkins) and Conaway or Davis had; that while he lived there F. R. Sinclair was an overseer of the county roads in that district, and he heard Sinclair authorize Marion Simpkins to work out his time and taxes upon said road running from the Bodley land to Craft's run. The witness stated that his father moved from Pennsylvania in 1800 or 1801. Does not know what road he moved on. There was no other road for him to move on but that road, from where he moved (from Jimtown) to this State. F. R. Sinclair testified: That he was seventy-one years of age, and was acquainted with the road in question. Was overseer of roads in that precinct, some time between 1875 and 1878, for two years; and that he, as such road surveyor, authorized Marion Simpkins, or gave him permission, to work out his road tax or per diem on said road running from the Bodley farm along the lands of James Lazzell, Asa Davis (now

owned by Peter Conaway), and Lorenzo Davis' land, to Craft's run. Could not say positively whether he so worked out his taxes one or two years. That the list of roads he had, and their collaterals, required to be worked; the word "collateral" being mentioned. He considered that road one of the collaterals. Furthermore, he was one of the supervisors of the county when the Pickenpaugh end was disannulled. The road not being disannulled all the way, he presumed that the balance of it was a county road. James Saunders, fifty-nine years old, testified: That he had lived in Maidsville all his life, and had known said road at least forty years, and he worked that road between 1850 and 1855 under his father, as surveyor, and that it was kept up by the public until the other road was made through Mr. Davis' and Conaway's. That he knew a part of the old road was discontinued after the other road was made. When he first knew that road, it was the main road that led through from Craft's run towards Taylortown and the Pennsylvania line, and it was the road that went toward Morgantown, and the new road that was opened gave an outlet to the people living up towards the north end of the road, and nearly all of this land, except defendant and Marion Simpkins. That he was surveyor of roads of precinct No. 2, Cass district, about 1881 or 1882 and 1888, and might have been before. Does not remember. He never worked that road himself. Was under the impression that he allowed Garlow and Simpkins a little time on that road, one time, but not positive. Did not know that defendant had any other public outlet from his land southward than the old road. Lorenzo Davis stated: That he was born in 1830, and had known that road ever since he could recollect, and had worked on it. Had worked on the piece that was discontinued, and the other part where it was not discontinued, where it needed work. Believed he had worked on that road under James Lazzell, as road overseer, and next believed he worked under John Saunders, and next was overseer himself. James Lazzell was father of the plaintiff. The majority of the road that was not disannulled, or discontinued from the west corner of Lazzell's land had a fence on both sides of it, and the other part of it was fenced up in the field, he believed, or

the most of it. He never knew of any obstructions or fence placed across the outlet of the Bodley land to Craft's run until in August, when it was done by the plaintiff, or some one for him. That, after a part of the old road was annulled, the defendant and Marion Simpkins had no other outlet, that he knew of, than this old road to Craft's run. The defendant testified in his own behalf, stating: That it was a public road. He had always had an outlet there, even after the north end of the old road had been annulled. That the plaintiff's father, James Lazzell, had removed his fence on a part of the road to take in the bed of the road, but had left out a passway for him, which he considered about as good as the old road, and had so used it for twelve years or fourteen years, until the plaintiff built the obstruction across it, in August, 1892. The appellee was examined in his own behalf, and states: That there is no dispute about the title to his land, that he knows of. That, at the time he acquired title to the land along the route of the old road, he did not consider it a public road. That it had not been kept up or used as a public road since he could remember; that he had worked on public roads for eighteen years or longer, and worked there for his father before he worked for himself. Never worked on that old road, and never knew of any overseer working it. The appellant and his family, and persons going to and from his house, have traveled over the lands, not only along the route of the old road, and across the commons, but going down the bottom from his house into the road near the southeast corner of appellee's land. Thinks they traveled this route as much as, if not more than, any other, when they were on business towards Maidsville, going both ways, until 1889, when appellee fenced off a little field, since which time they had not gone through there. That other persons, who had lived where appellant now lives before him, traveled that way to about the same extent. They traveled there because no objection was made, and because it was a shorter route to the public road. That he told them in August, 1892, that they could not haul timber through there, without they paid him for it. That his fence enclosed the old roadbed, as well as the rest of the and now enclosed, before the parties hauling defendant's

timber commenced to haul. That, where the appellant tore down the fence, it was a good strong fence. That on the 23d of August, 1892, he had served on appellant a written notice that he would rebuild the fence lately destroyed and torn down by him, closing up the outlet or lane extending from at or near appellant's line to the county road near the line betwen appellee and Peter Conaway, and if said fence so closing said outlet should be again torn down, damaged, or destroyed, the parties so offending would be punished to the full extent of the law. He does not remember just the number of times he rebuilt it, but a great many times. He saw the appellant and his timber hands tear it down several times. That he brought two suits against him for damages, but he continued his trespasses. That the route of the old road from appellant's land to the public road would not give an outlet to any other person but the defendant. The appellee was asked: "Did you not go before the county court at March term, 1892, and ask said court to allow you to close up the road from the northwest corner of James Lazzell's land to Limekiln hollow?" He answered: "I don't think I did ask them to allow me to close the road. In the first place, I did not consider that there was any road there. I told them about the condition of things there, and that I had a piece of land out in the commons there that had never been fenced in, and that the lower end of the road from Limekiln hollow to the lower end of the Asa Davis lot had been fenced in from 12 to 14 years; and I told them that I had a notion to fence in this commons at the lower end end there, and they said go ahead and fence it up. Question. Fence what up? Answer. You may call it outlet or commons; whatever you please; it is all the same. And, when I fenced in this outlet or commons, it left this old roadbed in my field; but the old roadbed did not extend only down to the lower end of the Asa Davis, except what had already been there from 12 to 14 years, but I had a piece of land out to the commons, that extended 50 or 75 yards on further down than the old market roadbed, that wasn't already fenced up; and then I built a fence across the Conway line, which included all, or very nearly all, that was out to the commons. Question. Did you not say to defendant, at Maidsville and in

Morgantown, since this suit began, that you did not mean to deprive him of ingress or egress to his place, by the building of the fence across the road, but that you only wanted to prevent Sidwell from hauling the timber over said road, or words of like import and meaning?   Answer. I did say to him that I did not build that fence to keep him and his family from going across my place, or words of that meaning, and for the same reason that I let him go across my place before without objections.   I don't know as I said anything about Sidwell, but I told him that I did not intend for them to haul timber through my land, tearing up the ground; that I considered it a big damage." Depositions of other witnesses were taken pro and con, which it is not necessary here to notice.

The cause came on to be heard February 23, 1897, upon the bill and exhibits filed therewith, and the injunction theretofore granted; the answer of the defendant, and exhibits filed therewith, and general replication thereto; and the demurrer to the plaintiff's bill, which demurrer was overruled; the depositions taken and filed in the cause, both on behalf of the plaintiff and defendant, and exhibits filed therewith ; and upon the papers read, orders entered, and proceedings had in the cause, and upon the motion of the defendant to dissolve the injunction,—and was argued by counsel, whereupon, after due consideration, the injunction was perpetuated, and the defendant's motion to dissolve the injunction overruled, with judgment for costs against the defendant, from which decree the defendant appealed, and assigned the following errors :   "(1) The court erred in not dissolving said injunction, and in not sustaining the demurrer to the said bill, because there is no equity in the bill.   It states no cause for the interposition of a court of equity.   It has been held a number of times by your honor's court that, before equity will enjoin a trespass to real estate, two things must co-exist :   First, good title must be shown in the plaintiff ; and, second, the damage done must be irreparable.   Upon the face of the said bill, there are no grounds for an injunction.   (2) If a court of equity has jurisdiction, no case is made by the plaintiff in his proof, and the court erred in refusing to dissolve the said injunction, and also in perpetuating it:

(a) The plaintiff's allegations are not proved, but clearly disproved.   He thoroughly concealed the true facts in this controversy, and proceeded on entirely a false basis.   (b) The plaintiff committed a trespass against the public in obstructing the public highway, and the defendant committed no trespass in removing the obstruction.   (c) The question solely presented is, was the old road, where this fence and obstruction were placed by said plaintiff, disannulled ?   It surely was not, as the evidence plainly shows that no part of the old road was disannulled until four years after the new road was established.   (d) The old road had been disannulled up to the north-west corner of the James Lazzell land, known as the 'Simpkins Land,' but no further, and the residue of the said old road had been left untouched, so that your petitioner and others could have an outlet from their farms as a public road."

"To warrant the interference of a court of equity to restrain a trespass, two conditions must co-exist:   First, the plaintiff's title must be undisputed, or established by legal adjudication; and, second, the injury complained of must be irreparable in its nature."   *Schoonover* v. *Bright*, 24 W. Va., 698.   The appellee files with his bill title papers, and offers other evidence showing conclusively that he has good title to the tract of one hundred and forty-three acres of land through which the old road passed, and upon which he complains that the trespass complained of was committed.   Appellant's contention is that the fence thrown down by him was built across the road,—hence, was not on the premises of appellee; that it was simply an obstruction which he had a right to remove.   If, as appellant claims, the south end of the old road was never annulled or vacated, but remained a public road, then it is clear that appellee's title to the land where he built the fence across the road was not undisputed.   In the proceedings to establish the new road, or alteration in the road, in 1862, and then again in 1864, it does not appear that a discontinuance of the old road was contemplated, as the new road was placed on a location such a distance from the old location, and abutted by other landowners, as to deprive the abutters on the old road entirely of an outlet in case it should be discontinued, and there seems to have

been no notice given of such discontinuance. While section 32, chapter 43, of the Code, provides (and the same provision then existed) that "when any road is altered, the former road shall be discontinued to the extent of such alteration and no further, and the new one established," yet without the notice required by section 30, chapter 43, no road can be discontinued. *Conrad* v. *County of Lewis*, 10 W. Va., 787. JUDGE GREEN, in delivering the opinion of the Court in that case says: "The law then provided, and still provides, two modes of proceeding in reference to roads. If a road is to be discontinued, the parties file their petition therefor; but, before it can be acted upon, notice of such petition must, three weeks, at least, before it is acted upon, be posted at the front door of the court house, and at three public places in every district in which any part of the road may be. Code, c. 43, s. 30; Acts 1872-73, c. 194, s. 30. If a road is to be established, the parties file their petition, and take certain steps before said petition is finally acted upon. The proprietors and tenants of the property which would have to be taken or injured if the road were established must be summoned, to show cause against it, but no public notice is given as required when a road is to be discontinued. Code, c. 43, ss. 35, 36; Acts 1872-73, ss. 35, 36. If a road is to be altered, a petition therefor is filed; but as such alteration necessarily implies the establishment of one road, and the discontinuance of another, it is obvious that the proprietors and tenants of the property to be taken or injured by the establishment of the new road must be summoned, and likewise the three-weeks public notice aforesaid must be given; for without this no road can be discontinued. The two proceedings establishing one road and discontinuing another, constituting together what is called an 'altering of a road,' are, for convenience, heard together on one petition; but it is obvious that the necessary steps to prepare each of these cases should be taken before the court acts upon them. The public has a right to be notified before an established road, which the public has a right to use, can be discontinued; and the proprietors have a right to be notified before their lands are taken to establish a new road. Before, therefore, a road can be altered, both the public

and the landholders affected by the establishment of the
new road must be notified.   It is obvious that it makes no
difference whether the whole or a part of a public road is
to be discontinued.   In either case the public has a right
to three-weeks notice aforesaid." For the establishment,
alone, of a road, no public notice is required; but the pro-
prietors and tenants whose property is to be taken or in-
jured, if the road were established, must be summoned to
show cause against it.   This was done in this case, but
there is no evidence that public notice was given; and, the
old road being kept open, for years after the establish-
ment of the new, the whole distance, then, in 1869, a regu-
lar proceeding, under section 30, chapter 43, Code, to dis-
continue a part only, and the discontinuance of such part
by the proper authorities of the county, show clearly that
it was not the intention of such authorities to discontinue
the old road.   While the steps taken for the establishment
of the new road were regular and sufficient for that pur-
pose, it does not appear that any were taken for the dis-
continuance of the old until some years after, when pro-
ceedings were had to discontinue a part of it only.   "If it
is shown that a highway was once laid out pursuant to law,
or created by dedication, the burden of showing a discon-
tinuance, abandonment, or vacation is upon the party who
asserts that the public and the abutting owners have lost
or surrendered their rights.   In the absence of satisfac-
tory evidence of discontinuance, vacation, or abandonment,
the presumption is in favor of the continuance of the high-
way, with the principal and incidental rights attached to
it.   Not only is this so by force of the maxim we have
quoted ["Once a highway always a highway"], but it is so
by force of the elementary rule that 'a thing shown
to exist is presumed to continue until the contrary is
made to appear.'" Elliott, Roads & S., p. 658.   "An
abutting owner cannot be deprived of the street affording
him access to his premises unless there is left for his use
and enjoyment other suitable means of access, or just
compensation is paid him for the deprivation of the same."
*Egerer* v. *Railroad Co.* (N. Y. App.) 29 N. E. 95; *Railroad
Co.* v. *Applegate,* 3 Dana, 239; *Haynes* v. *Thomas,* 7 Ind. 38.
"The right of the owner of a lot in a town or city to the use

of the abjoining street is as much property as the street itself. The owner of the lot cannot be deprived of this right by the obstruction of the street, without compensation." *Lackland* v. *Railroad Co.*, 31 Mo., 180.

It appears from the record that appellee's grantor at one point encroached upon and fenced up the old roadbed, but left room on his land alongside of it for the road, some twelve or fourteen years before the institution of this suit, which new location has since been used as such road, and which is at the point where appellee built the fence across it in August, 1892; and he now contends that under section 20, chapter 35, Code, he can hold it under the limitation there provided. If it was a public road, as appellant contends, his (appellee's) action in the premises (the surveyor consenting or acquiescing therein) would simply work a change or alteration in the road, under section 21, chapter 43, and the new would be substituted for the old. *Bridge Co.* v. *Summers*, 13 W. Va., 477; also, *Almy* v. *Church*, 18 R. I., 182, (26 Atl. 58).

It is contended by appellee that appellant, in his answer, does not controvert or deny the allegation in the bill that appellee has clear and uncontrovertible title, and that defendant does not claim the title to the land, or any part of it, and therefore it must be taken as true, for the purposes of this suit. Code, c. 125, s. 36. Appellant, while not claiming title in himself to any part of the land, denies the right of the appellee to the land where the fence was built which he threw down, and claims that he had the right to use it as a road. And it may be a public highway, "though it leads only from a public road to the dwelling or farm of a single person." *Varner* v. *Martin*, 21 W. Va., 534; *Lewis* v. *Washington*, 5 Grat., 265. "A bill of injunction should contain a distinct averment of irreparable injury, and the facts must appear on which the allegation is predicated, in order that the court may be satisfied as to the nature of the injury." *Farland* v. *Wood*, 35 W. Va., 458, (14 S. E. 140). Appellee makes no allegation of the insolvency of appellant, and the trespasses alleged are such that there could be no difficulty in ascertaining the damages in an action at law. As is said in *Cresap* v. *Kemble*, 26 W. Va., 606, as a general rule an injunction is not granted to restrain a

mere trespass to real property, "when the injury complained of is not destructive of the aubstance of the inheritance,—of that which gives it chief value,—or is not irreparable, but is susceptible of complete pecuniary compensation, and for which the party may obtain adequate satisfaction in the law courts," and should in no such case be granted in the absence of an allegation of the insolvency of the defendant. The pleadings and proof show that the title was in dispute, and, in my opinion, upon the hearing of the cause the circuit court should have sustained the appellant's motion to dissolve the injunction and dismiss the bill. The decree perpetuating the injunction is reversed, and the injunction granted in said cause is dissolved, and the bill dismissed.

<em>Reversed.</em>